FEHRENBACH et al., Appellants,

v.

O'MALLEY et al., Appellees.

[Cite as *Fehrenbach v. O'Malley,* 164 Ohio App.3d 80, 2005-Ohio-5554.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–040128.

Decided Oct. 21, 2005.

84

John Metz, for appellants.

Lindhorst & Dreidame, Michael F. Lyon, and Bradley D. McPeek, for appellees.

---

SYLVIA SIEVE HENDON, Judge.

{¶ 1} Plaintiffs-appellants, Gina and Thomas Fehrenbach, individually and on behalf of their minor daughter, Tara Fehrenbach, appeal the judgment of the trial court entered on a jury's verdict in favor of the defendants in a medical-malpractice action. Defendants-appellees are pediatrician Kathryn O'Malley, M.D., and her employer, Suburban Pediatric Associates.

{¶ 2} On October 1, 1990, 14–month–old Tara awoke with a temperature of 105.2 degrees. She had vomited and was "lethargic." Her mother, a nurse, called O'Malley's office and set up an appointment for three o'clock that afternoon. O'Malley examined Tara at that time and diagnosed her as suffering from a severe double-ear infection. She prescribed an oral antibiotic and Tylenol. Fehrenbach returned with Tara the next morning, informing the doctor that Tara's fever had not registered lower than 104 degrees, that she was still vomiting, and that she was "real lethargic." O'Malley concluded, after an examination, that Tara was still suffering from ear infections. She told Fehrenbach to continue with the oral antibiotic and Tylenol and to give fluids for hydration.

{¶ 3} Tara's temperature was lower the morning of October 3, and she was able to sit up for a short time and eat a little. But her fever spiked again, and she began pressing her head into her mother's arm. That evening, Tara's parents took her to the emergency room at Children's Hospital after talking to the on-call pediatrician at Suburban Pediatric. Fluid from a lumbar puncture revealed that Tara had bacterial meningitis. Her spinal fluid contained over one million colonies of the responsible bacteria, penicillin-resistant streptococcal pneumonia.

She was given the antibiotic ceftriaxone intravenously and remained hospitalized for a month.

{¶ 4} While hospitalized, Tara suffered several strokes and developed a condition referred to as hydrocephalus when her body's ability to drain cerebral spinal fluid was compromised. A permanent shunt had to be placed in her head to draw out the cerebral spinal fluid. Her treating neurosurgeon, Dr. Kerry Crone, diagnosed her as suffering from sequelae as a result of the meningitis and hydrocephalus, including a Chiari 1 malformation, arachnoiditis, syringomylia, and an unsteady gait when she ran.

{¶ 5} Tara has not demonstrated any cognitive impairment. She has had multiple brain surgeries to remedy complications from the shunt, and she has had to have back surgery to remedy chronic back pain.

{¶ 6} Several months after Tara was diagnosed with meningitis, Tara's parents, upon the advice of an attorney friend, began compiling a summary of the medical events that had occurred and the medical events that would occur during the next seven years. The summary was put together over a course of time based upon personal recollections and knowledge.

{¶ 7} Tara, through her parents, sued O'Malley and her employer almost seven years after the alleged malpractice. Her parents filed a loss-of-consortium claim at the same time. The trial court ruled that the parental consortium claim was barred by the statute of limitations and granted partial summary judgment to the defendants on this claim prior to trial.

{¶ 8} At trial, the Fehrenbachs' expert, Dr. Larry Baraff, testified that O'Malley had deviated from the standard of care in not ordering a septic workup, consisting of a lumbar puncture and a complete blood count ("CBC"), on October 1 and 2, after Tara experienced a high fever, vomiting, and lethargy. According to the expert, O'Malley also deviated from the standard of care in not ordering the intravenous administration of the antibiotic ceftriaxone. Earlier treatment would have either prevented the bacteria in Tara's blood from infecting the mengis or attacked the meningitis at a much earlier time, lowering the chance for hydrocephalus and the other sequelae. Dr. Lowell–Sung–Yi Young and Dr. Carol Miller testified that O'Malley had deviated from the standard of care in not ordering the septic workup and the intravenous administration of ceftriaxone on October 1 and 2. They further opined that had O'Malley properly diagnosed and treated the meningitis, Tara more likely than not would have recovered without developing hydrocephalus and the other sequelae. Dr. Miller further opined that the permanent shunt implanted in Tara's head carried with it a lifelong risk of malfunctioning and infection, and the existence of the shunt was likely to affect her life expectancy. Tara's treating neurologist, Dr. Kerry Crone, and Edmund Provder, a life-care manager, also presented evidence on damages.

{¶ 9} O'Malley's expert Dr. Robert Lerer testified that the standard of care did not require O'Malley to perform a septic workup on October 1 or 2, 2000, because Tara's condition did not meet the medical definition of "lethargic" and she had only nonspecific symptoms. Another defense expert, Dr. Harley Rotbart, opined that Tara did not develop the meningitis until the 12– to 24–hour period prior to being admitted to the hospital. Therefore, O'Malley would have obtained a negative result had she taken a lumbar tap on October 1 or 2. Dr. Rotbart did concede, however, that a complete blood count would have revealed the existence of a bacterial infection of the blood that would have required the intravenous administration of stronger antibiotics. Finally, he testified that the earlier administration of intravenous antibiotics would not have made a difference in preventing the hydrocephalus because of the virulent nature of the infection. A third expert, Dr. Elias Chalub, testified that Tara did not develop meningitis until October 3 and that the Chiari 1, arachnoiditis, and syringomylia were congenital malformations, not sequelae from the infection or the hydrocephalus.

## Improper Conduct of Defense Counsel

{¶ 10} Throughout the eight-day jury trial, defense counsel repeatedly resorted to improper remarks and arguments concerning the plaintiffs, plaintiffs' counsel, and plaintiffs' expert witnesses.

{¶ 11} He accused Tara's parents of "shameful" behavior in bringing the claims against O'Malley and often portrayed them as liars and "manipulators" using their daughter to collect a "two-million-dollar paycheck." Although he did not object to the admission of the parents' typed summary of medical events (in fact, it was a defense exhibit), he referred to it as their "alleged recollections." He accused the parents of manufacturing the malpractice claim based upon years of researching the symptoms of meningitis. Additionally, he improperly implied that Tara's malpractice claim was filed too late.

{¶ 12} For example, during closing argument, after accusing Tara's mother of transforming her love of Tara into "almost an obsession" that caused her to lie, he continued, "She [Gina Fehrenbach] read up on some medical journals and books. She learned the symptoms of meningitis, and this is why I'm going to be really disenchanted here, because they took seven years to piece together the case, seven years to try to figure out what are the symptoms. Let's put them in. That's not fair. That's not fair. That's not right. That is not fair. I don't understand that. I don't. I really don't."

{¶ 13} He returned to this theme later, stating, "And I submit to you that the plaintiffs have, unfortunately, unfortunately, and I don't know why, but they have, unfortunately, in my view, over the years, prepared a case to try to fit their theory of negligence so that they can come into this courtroom and win a big

verdict. Why on earth would you wait seven years to file a lawsuit if you really thought this doctor was wrong? My gosh. And they wonder why Doctor O'Malley can't remember stuff, things. It's just not right."

{¶ 14} He also incorrectly informed the jury, over objection, that the Fehrenbachs were "required" to tell O'Malley that they were dissatisfied with her performance before they could file a lawsuit against her.

{¶ 15} Counsel consistently misquoted and mischaracterized the deposition testimony of Tara's treating neurosurgeon, Dr. Crone, concerning Tara's future need for shunt revisions, in order to bolster his offensive comments about the Fehrenbachs. When asked about Tara's need to have shunt revisions after age 21, Dr. Crone had stated that the need for revisions was "much less in the adult world." But counsel repeatedly stated to the jury that Dr. Crone had said that it was highly probable she would not need any revisions after the age of 21. At one point, during the cross-examination of Tara, counsel asked, "Do you know that Doctor Crone's opinion is that as you get to about the age of twenty one he doesn't foresee you having to need any more revisions?" After plaintiff's counsel objected, defense counsel told the court and the jury that the information was a quote from Doctor Crone's deposition. He then asked Tara, in an effort to demonize her parents, "Have your parents kind of implied that maybe things aren't going to be good in the future?"

{¶ 16} Plaintiffs' counsel and their expert witnesses were also targets of defense counsel's inappropriate and prejudicial comments. During opening statement, counsel told the jury that plaintiffs' counsel and expert witnesses would present a case of "hyperbole," "exaggeration of sequelae," and "exaggeration of testimony." During closing argument, defense counsel accused plaintiffs' counsel of "manipulation of the highest ground" and informed the jury that counsel's strategy was to "truck in 55 people and pay them $8,000 apiece to say what you want them to say. * * * This has been a case * * * based on total sympathy, total sympathy." He called the Fehrenbachs' life-care-manager expert witness an "idiot" and accused the Fehrenbachs of bringing him in "to try and make it look like she [Tara] is just a wreck," adding, "That's just wrong. Why? Because it's the truth? No. Why? Because she has profound and catastrophic brain damage and convescence? No. Why? Because she's laying awake at night thinking of death and dying. She's not. At times she does. * * * Because of money. Because of money." Counsel also accused Tara's neurosurgeon, Dr. Crone, of "play[ing] some games" in testifying that Tara's Chiari 1 malformation had developed due to her meningitis.

{¶ 17} In reference to the Fehrenbachs' experts, counsel said, "Nobody in their right mind would give the testimony they gave you. * * * I submit to you that if you listen to the science of the case, not something made up by plaintiffs' experts,

not something that is being advanced simply to get a $2,000,000 check so you can blow this doctor away, but the science of the case."

{¶ 18} Further, defense counsel used improper inflammatory comments to bolster the jury's sympathy for O'Malley. At the beginning of the trial, during opening statement, defense counsel indicated that a plaintiffs' verdict would end O'Malley's career. He informed the jury, "Doctor O'Malley did what she could do based on what she had then. And I suggest that your verdict at the end of this case will allow her to continue to practice." Another inappropriate remark, made during closing argument in which counsel vouched for O'Malley, was interrupted: "I'm proud to speak for this good doctor, and I always will be. * * * She gets up every morning and she carries to work every day the responsibilities and her training and her sensitivity for children eight hours a day. And the anxieties that they carry with them——." After the court overruled an objection, defense counsel added, "This is not an ATM machine. You don't put a card in and out comes $2,000,000."

{¶ 19} Defense counsel returned to the ATM theme later in closing argument when he begged the jury to be sympathetic to the "good doctor": "In order to be fair to this good doctor, I haven't heard one thing for two weeks, not a thing for two weeks, about Katie O'Malley, other than you know, she was negligent, she didn't care, she's caused the injury; not one recognition by these people, either through their counsel or through their experts or alleged experts, that just maybe this is a human being, this is not an ATM machine."

{¶ 20} Finally, during closing argument, defense counsel made inflammatory comments to the jurors concerning their role, including the following: "You're going to be known by what you carry. You're going to carry that verdict back here. And that verdict will be what speaks for this community as it relates to this kind of case, and the behavior and conduct. * * * You will speak for this community. * * * And in my view, based upon what has happened in this courtroom, the only, the only verdict which would speak for this community is this: Dr. O'Malley acted in accordance with the standard of care. She did nothing or failed to do nothing to cause this lovely, lovely little girl injury or harm. And that you, with that verdict, would once again stand for the proposition in this country that we are going to not allow this type of conduct in our courtrooms, to try to get a $2,000,000 paycheck. I know you'll do the right thing."

{¶ 21} After the eight-day trial, the jury found no negligence on the part of the defendants and returned a verdict in their favor. The trial court denied the Fehrenbachs' motion for a new trial or for judgment notwithstanding the verdict. This appeal followed.

{¶ 22} In their first assignment of error, the Fehrenbachs argue that the trial court erred in permitting defense counsel to make improper and inflammatory comments and arguments to the jury throughout the trial. They present two legal maxims to support this argument. First, "[c]ounsel is obligated to refrain from unwarranted attacks on opposing counsel, the opposing party and the witnesses,"[1] and second, "[w]here gross and abusive conduct occurs, the trial court is bound, sua sponte, to correct the prejudicial effect of counsel's misconduct."[2]

{¶ 23} The Ohio Supreme Court has recognized that trial counsel's inappropriate comments and abusive tactics can undermine the fair and impartial administration of justice. In *Pesek v. Univ. Neurologists Assn., Inc.*,[3] where defense counsel for pediatric neurologists made assertions and drew many inferences that were not warranted by the evidence during closing argument, the court held that the misconduct was a sufficient basis for a new trial. The court found the attacks on plaintiffs' counsel and expert witnesses "inexcusable, unprincipled, and clearly outside the scope of final argument[,] * * * creating an atmosphere surcharged with passion or prejudice."[4] The court concluded that the misconduct warranted a reversal and a new trial, regardless of the fact that plaintiff's counsel did not object to most of the improper comments, because the trial court had a duty to intervene sua sponte and admonish counsel and to correct the prejudicial effect of the misconduct.[5]

{¶ 24} We have recently reiterated these principles to the bench and bar, including present defense counsel. In *Roetenberger v. Christ Hospital*[6] and *Furnier v. Drury*,[7] both medical-malpractice cases, we reversed a judgment in favor of the treating physician where defense counsel had repeatedly made improper remarks clearly designed to arouse the jury's passion and prejudice.

{¶ 25} The law is unambiguous: "When argument spills into disparage-

---

1. *Furnier v. Drury*, 163 Ohio App.3d 793, 2004-Ohio-7362, 840 N.E.2d 1082, ¶ 11, citing *Jones v. Macedonia–Northfield Banking Co.* (1937), 132 Ohio St. 341, 8 O.O. 108, 7 N.E.2d 544, and *Dillon v. Bundy* (1991), 72 Ohio App.3d 767, 596 N.E.2d 500.

2. *Snyder v. Stanford* (1968), 15 Ohio St.2d 31, 37, 44 O.O.2d 18, 238 N.E.2d 563.

3. (2000), 87 Ohio St.3d 495, 721 N.E.2d 1011.

4. Id. at 501–502, 721 N.E.2d 1011 (internal citation omitted).

5. Id. at 501, 721 N.E.2d 1011.

6. 163 Ohio App.3d 555, 2005-Ohio-5205, 839 N.E.2d 441.

7. 163 Ohio App.3d 793, 2004-Ohio-7362, 840 N.E.2d 1082.

ment not based on any evidence, it is improper."[8] In this case, defense counsel made improper comments and arguments repeatedly, presenting a defense not warranted by the evidence that was intended to mislead the jury. Most outrageous were the disparaging comments directed towards the Fehrenbachs and their counsel. Defense counsel repeatedly called the Fehrenbachs "shameful" parents who were using their child's illness and medical complications to "collect a $2,000,000 paycheck" by lying and, with counsel's help, "trucking" in "alleged" experts paid "$8,000 apiece to say what [they] wanted them to say." Counsel further told the jury that Tara's parents had spent seven years reading up on medical journals and books and learning the symptoms of meningitis to "piece together the case."

{¶ 26} The evidence in this case did not warrant such a diatribe.[9] The comments were offensive and prejudicial to the plaintiffs and to the integrity of the judicial system. Defense counsel's statements went far beyond the wide latitude provided to counsel in opening statement and closing argument.[10] We wholeheartedly agree with the Fehrenbachs' statement in their appellate brief that "[e]very citizen should have a fair trial and not merely a Hollywood attack show. Such conduct demeans our entire system. We all lose."

■ {¶ 27} Further, defense counsel's strategy of arousing sympathy for O'Malley was pervasive and cannot be ignored. When counsel "deliberately attempts to influence and sway the jury by a recital of matters foreign to the case, which matters he knows or ought to know cannot be shown by competent or admissible evidence, * * * it may constitute the basis for ordering a new trial or for the reversal by a reviewing court of a judgment favorable to the party represented by such counsel."[11]

■ {¶ 28} Defense counsel's improper remarks in this case were clearly designed to arouse the jury's passion and prejudice. We conclude, as did the *Pesek*, *Roetenberger*, and *Furnier* courts, that regardless of the fact that plaintiffs' counsel did not object to each improper comment, reversal of the judgment is necessary because there is a substantial likelihood that the jury was misled and that the verdict was influenced by defense counsel's "gross and abusive con-

---

**8.** *Clark v. Doe* (1997), 119 Ohio App.3d 296, 307, 695 N.E.2d 276, citing *Cusumano v. Pepsi–Cola Bottling Co.* (1967), 9 Ohio App.2d 105, 38 O.O.2d 132, 223 N.E.2d 477.

**9.** Id.

**10.** See *Maggio v. Cleveland* (1949), 151 Ohio St. 136, 38 O.O. 578, 84 N.E.2d 912, paragraph two of the syllabus; *Pesek*, 87 Ohio St.3d at 501, 721 N.E.2d 1011.

**11.** *Maggio*, paragraph two of the syllabus.

duct."[12] In holding that the Fehrenbachs are entitled to a new trial on their malpractice claim, we are mindful that "if 'there is room for doubt, whether the verdict was rendered upon the evidence, or may have been influenced by improper remarks of counsel, that doubt should be resolved in favor of the defeated party.' "[13]

{¶ 29} Accordingly, the first assignment of error is sustained.

{¶ 30} We now address the remaining assignments alleging prejudicial error at trial.

■ {¶ 31} The second assignment of error alleges that the trial court erred by not instructing the jury that Tara had until her 19th birthday to file her malpractice claim. The Fehrenbachs argue that the jury should have been informed of this because O'Malley repeatedly impressed upon the jury that O'Malley was forced to defend against a claim that should have been filed sooner.

{¶ 32} We overrule the second assignment of error because an instruction to the jury on the statute of limitations was not warranted where the timeliness of the lawsuit should not have been an issue for the jury to decide. Tara's malpractice claim was filed well within the limitations period.

## Use of a Learned Treatise as Substantive Evidence

■ {¶ 33} The third assignment of error alleges that the trial court erred by permitting O'Malley to use a learned treatise as substantive evidence. The alleged error occurred when O'Malley's expert, Dr. Rotbart, read to the jury several sentences from an article he did not author during redirect examination. The Fehrenbachs' counsel had impeached Dr. Rotbart during cross-examination with one sentence from the article.

■■ {¶ 34} Evid.R. 706 specifically limits the use of statements contained in learned treatises to impeachment. Such statements are considered hearsay and are not admissible to prove the truth of the matter asserted therein.[14] Where hearsay statements are used to provide context and rehabilitate an expert on

---

12. *Pesek,* 87 Ohio St.3d at 501, 721 N.E.2d 1011, quoting *Snyder v. Stanford* (1968), 15 Ohio St.2d 31, 37, 44 O.O.2d 18, 238 N.E.2d 563.

13. Id. at 502, 721 N.E.2d 1011, quoting *Warder, Bushnell & Glessner Co. v. Jacobs* (1898), 58 Ohio St. 77, 85, 50 N.E. 97.

14. See *Hallworth v. Republic Steel Corp.* (1950), 153 Ohio St. 349, 41 O.O. 341, 91 N.E.2d 690, paragraph two of the syllabus; *Ramage v. Cent. Ohio Emergency Serv., Inc.* (1992), 64 Ohio St.3d 97, 110, 592 N.E.2d 828.

redirect, they are not being used to impeach, and, therefore, such uses are prohibited under the rule.[15]

{¶ 35} The trial court erred by overruling the Fehrenbachs' objection and allowing the hearsay statements to be received as substantive evidence during Dr. Rotbart's testimony. While Dr. Rotbart was not a liability expert, the statements addressed both liability and damages and likely affected the outcome of the case, especially when coupled with the other errors that occurred.[16] Under these circumstances, we reject the defendants' argument that the error was harmless because the jury had heard the gist of the hearsay from other witnesses.[17] The assignment of error is sustained.

### Cross–Examination on the Commonality of Insurance

{¶ 36} The fourth assignment of error alleges that the trial court erred by not permitting the Fehrenbachs to cross-examine Dr. Lerer, the defendants' sole liability expert, about his commonality of insurance with the defendants.

{¶ 37} Under Ohio law, an expert's bias and pecuniary interest can be fair subjects for cross-examination.[18] "In a medical malpractice action, evidence of a commonality of insurance interests between a defendant and an expert witness is sufficiently probative of the expert's bias as to clearly outweigh any potential prejudice evidence of insurance might cause."[19] Accordingly, an expert witness having the same malpractice insurer as a defendant is subject to inquiry concerning bias if the witness testifies favorably for that defendant.[20]

{¶ 38} In this case, Dr. Lerer and the defendants carried professional liability insurance from the same insurance carrier. The Fehrenbachs' counsel sought to cross-examine Dr. Lerer on any potential bias Dr. Lerer might have had for the defendants due to this commonality of insurance. Defense counsel objected to questioning concerning the commonality of insurance. The trial court sustained

---

15. See *Toth v. Oberlin Clinic, Inc.*, 9th Dist. No. 01CA007891, 2002-Ohio-2211, 2002 WL 987559; contra *Hinkle v. Cleveland Clinic Found.*, 159 Ohio App.3d 351, 2004-Ohio-6853, 823 N.E.2d 945, discretionary appeal allowed in 105 Ohio St.3d 1560, 2005-Ohio-2447, 828 N.E.2d 116.

16. See *O'Brien v. Angley* (1980), 63 Ohio St.2d 159, 164–165, 17 O.O.3d 98, 407 N.E.2d 490.

17. Compare *Beard v. Meridia Huron Hosp.*, 106 Ohio St.3d 237, 2005-Ohio-4787, 834 N.E.2d 323.

18. See *Furnier*, supra, citing *Calderon v. Sharkey* (1982), 70 Ohio St.2d 218, 24 O.O.3d 322, 436 N.E.2d 1008, and *Clark v. Doe*, supra.

19. *Ede v. Atrium S. OB–GYN, Inc.* (1994), 71 Ohio St.3d 124, 642 N.E.2d 365, syllabus.

20. See *Davis v. Immediate Med. Serv., Inc.* (1997), 80 Ohio St.3d 10, 16, 684 N.E.2d 292.

the objection and did not permit the Fehrenbachs' counsel to cross-examine Dr. Lerer on this point.

{¶ 39} But defense counsel later conceded it was proper to cross-examine on the commonality of insurance carriers and agreed to a "stipulation" informing the jury of the commonality of insurance at the end of the trial, during the general jury instructions.

{¶ 40} We hold that the trial court abused its discretion in denying the Fehrenbachs the opportunity to cross-examine Dr. Lerer about his bias stemming from his pecuniary interest in the outcome of the case. We further hold that the stipulation—read to the jury two days and ̀six witnesses removed from Dr. Lerer's testimony—was inadequate to render the error harmless in this case. The stipulation was an insufficient substitute for the timely and poignant cross-examination of a key adverse witness in a close case. Under these circumstances, the trial court's improper evidentiary ruling prejudiced the Fehrenbachs' substantial rights.[21] The assignment of error is sustained.

### Jury Instructions

{¶ 41} The sixth assignment of error alleges that the trial court erred in instructing the jury. The court is required to instruct the jury on the law of the case in light of the evidence adduced.[22] In reviewing whether the evidence supports a particular jury instruction, "an appellate court should determine whether the record contains evidence from which reasonable minds might reach the conclusion sought by the instruction." [23]

{¶ 42} First, the Fehrenbachs argue that the court should have instructed the jury on the "loss of chance doctrine." This theory, more accurately referred to as the "loss of less than even chance of recovery or survival," allows for compensation when a person injured by a health-care provider's negligent act or omission had a less-than-even chance of recovery or survival and the health-care provider's negligent act or omission increased the risk of harm.[24] In other words, the instruction is used in cases where a plaintiff cannot prove proximate cause from the negligence because, even without the malpractice, he was more likely than not to suffer the injury.[25] The instruction allows the jury to award

---

21. Id. at 17, 684 N.E.2d 292.

22. See *Murphy v. Carrollton Mfg. Co.* (1991), 61 Ohio St.3d 585, 591, 575 N.E.2d 828.

23. Id.

24. See *Roberts v. Ohio Permanente Med. Group, Inc.* (1996), 76 Ohio St.3d 483, 668 N.E.2d 480, paragraph one of the syllabus.

25. See *McMullen v. Ohio State Univ. Hosp.* (2000), 88 Ohio St.3d 332, 339, 725 N.E.2d 1117.

damages in direct proportion to the chance of survival or recovery that the plaintiff lost as a result of the negligence.[26]

{¶ 43} The Fehrenbachs argue that the instruction was warranted because Dr. Young testified that had Tara been properly diagnosed and treated, she would have had an 80 percent chance for a full recovery. But this evidence did not demonstrate that Tara had a less-than-even chance of full recovery even with proper diagnosis and treatment; in fact, it demonstrated the opposite. The instruction is not applicable when the plaintiff demonstrates a more than even chance of a full recovery with proper diagnosis and treatment.[27] Accordingly, the court did not err in declining to give a "loss of chance" instruction.

{¶ 44} Next, the Fehrenbachs argue that the court should have given the following instruction on punitive damages: "In a case involving medical malpractice where liability is determined against the doctor and compensatory damages are awarded, punitive damages may be awarded upon a showing of actual malice. * * * [A]n intentional alteration [or] falsification of medical records by a doctor, to avoid liability for his or her medical negligence, is sufficient to show actual malice, and punitive damages may be awarded whether or not the act of altering, falsifying or destroying records directly causes compensable harm."

{¶ 45} The instruction, derived from the syllabus of *Moskovitz v. Mt. Sinai Med. Ctr.*,[28] was a correct statement of the law. The Fehrenbachs claim that the instruction was warranted because the evidence at trial—unexpectedly—supported the conclusion that O'Malley had altered Tara's medical chart. They orally moved to amend the complaint under Civ.R. 15(B) to account for this evidence. O'Malley objected to any amendment and to the inclusion of a *Moskovitz* instruction, arguing that the claim exposed her to uninsured liability for an intentional act and that the lack of notice denied her the ability to hire independent counsel to protect her uninsured interest. The trial court denied the Fehrenbachs' motion to amend and declined to give the *Moskovitz* charge. We note the Fehrenbachs have not assigned as error the court's ruling on the motion to amend.

{¶ 46} Under these circumstances, we conclude that any error in the court's failure to instruct was harmless for two reasons: (1) the claim for punitive damages was not at issue in the case when the jury was instructed; and (2) even

26. *Roberts* at 488–489, 668 N.E.2d 480; see, also, 3 Ohio Jury Instructions (2004), 171–172, Section 331.15.

27. See *Wilson v. Horton*, 1st Dist. No. C–040193, 2004-Ohio-6841, 2004 WL 2913562, ¶ 6.

28. (1994), 69 Ohio St.3d 638, 635 N.E.2d 331.

if the issue had been in the case, the jury could not have awarded punitive damages after it found in favor of the defendants and awarded no compensatory damages in connection with the malpractice claim.[29]  But now O'Malley has notice of the Fehrenbachs' intention to pursue punitive damages against her for the alleged alteration of Tara's medical records.  Armed with this knowledge, she can act accordingly if the trial court on remand allows the Fehrenbachs to amend their complaint to add a claim for punitive damages.

{¶ 47}  Finally, the Fehrenbachs argue that the court erred by instructing the jury that there were "different methods" of diagnosing Tara's medical condition.  The court instructed the jury as follows: "Although some other physician in the specialty might have used a method of diagnosis, treatment, or procedure different than that used by the defendant, this circumstance will not by itself, without more, prove that the defendant was negligent.  The mere fact that the defendant used an alternative method of diagnosis, treatment or procedure is not by itself, without more, proof of her negligence.  You are to decide whether the diagnosis, treatment and procedure used by the defendant was reasonably careful, cautious, prudent and in accordance with the standard of care required of a physician specialist in the field of practice."

{¶ 48}  Where there is evidence that more than one method of diagnosis or treatment is acceptable for a particular medical condition, the "different methods" instruction is used to inform the jury that any one of the methods can be used and that the selection of one method over another is not in and of itself negligence.[30]  In this case, the "different methods" instruction was not warranted because there was no evidence that O'Malley had used an alternative but acceptable method to diagnose meningitis.  Her defense to the malpractice claim was that Tara's symptoms were nonspecific and that she was acting within the standard of care when she diagnosed and treated Tara for ear infections.  All the experts agreed that if Tara's symptoms included a high fever, vomiting, and true lethargy, the standard of care required O'Malley to perform a blood workup and a lumbar tap to rule out meningitis and sepsis.  O'Malley did not perform either.

{¶ 49}  Therefore, the court erred by instructing the jury that there were alternative methods of diagnosis or treatment.  But the Fehrenbachs failed to object to this instruction at a time when the trial court could have prevented the error.  Under these circumstances, we hold that they have waived the right to

---

**29.**  See *Moskovitz,* 69 Ohio St.3d at 649–650, 635 N.E.2d 331.

**30.**  See *Pesek,* 87 Ohio St.3d at 498, 721 N.E.2d 1011.

object to the instruction on appeal.[31]    Accordingly, the sixth assignment of error is overruled.

### "Anecdotal" Testimony

{¶ 50} The seventh assignment of error alleges that the trial court erred in permitting defense experts Dr. Lerer and Dr. Rotbart to give "anecdotal" testimony that impermissibly allowed them to provide the factual details of other cases and to make comparisons without such cases being in evidence.

{¶ 51} We have reviewed the portions of the transcript cited by the Fehrenbachs in support of this argument and note that they failed to object at trial to half of the testimony.  Any error in the admission of the unobjected-to testimony has been waived, as the admission of this testimony did not rise to the level of plain error.[32]  The other half of the testimony was objected to, but in all but one instance, the court sustained the Fehrenbachs' objections and struck what was challenged.  We hold that the trial court's action was sufficient to remedy any impropriety.  The remaining testimony came when Dr. Lerer was asked by defense counsel if "some percentage of those [meningitis] patients that you treated timely with antibiotics still experienced complications and sequelae."  Dr. Lerer responded by discussing his meningitis patients and their different outcomes.  The Fehrenbachs' counsel moved to strike the testimony but stated no basis for the objection, which was overruled.

{¶ 52} In this final instance, we hold that the trial court did not abuse its discretion in overruling the unexplained objection.  The trial court, as well as opposing counsel, must be made aware of the objecting party's specific ground for striking testimony when it is not obvious from the context.[33]  Further, even if the trial court erred, the testimony concerned the issue of damages, and the court's failure to strike this testimony could not have substantially prejudiced the Fehrenbachs because the jury, after finding no liability, never reached the issue of damages.  The assignment of error is overruled.

### Exclusion of CVs

{¶ 53} The eighth assignment of error alleges that the trial court erred in refusing to admit as exhibits the Fehrenbachs' experts' curricula vitae ("CVs"),

31.   See Civ.R. 51(A).

32.   See *Goldfuss v. Davidson* (1997), 79 Ohio St.3d 116, 679 N.E.2d 1099, syllabus.

33.   See Evid.R. 103(A)(1).

where defense counsel did not object to the CVs at the time the witnesses' videotaped trial depositions were taken.

{¶ 54} A trial court has discretion to exclude relevant evidence if its probative value is substantially outweighed by the needless presentation of cumulative evidence.[34] Absent a clear and prejudicial abuse of discretion, the trial court's determination not to admit such evidence should not be reversed on appeal.[35]

{¶ 55} At the trial depositions, the Fehrenbachs' counsel had the experts explain their education and training. He did not have each expert read a CV containing pages of authored articles and chapters into the record; rather, he marked each CV as an exhibit and had each expert identify his own CV and confirm that it was complete, true, and up to date. But each of the experts did testify to the fact that he had authored medical literature, except for Dr. Korobkin, a damages expert. At the time the trial depositions were taken, defense counsel did not object to the qualification of the experts or to the use of the CVs as exhibits. Later, at trial, when the Fehrenbachs' counsel moved to admit the CVs into evidence for the jury's review, defense counsel objected. The trial court did not allow the CVs into evidence because information in them was cumulative to the experts' testimony about their qualifications and training.

{¶ 56} We conclude that this decision was reasonable under the circumstances and that, accordingly, there was no abuse of discretion. The eighth assignment of error is overruled.

### New Opinion of Expert Witness

{¶ 57} In the ninth assignment of error, the Fehrenbachs argue that the trial court erred in allowing defense expert Dr. Rotbart to render a new opinion at trial concerning when Tara had developed meningitis. Initially, we reject the argument that the failure to make Dr. Rotbart's deposition transcript a part of the record is fatal to the Fehrenbachs' claim, as Dr. Rotbart both admitted at trial that he had added to his deposition testimony and explained the addition.[36] Ultimately, though, we conclude that the court's refusal to strike Dr. Rotbart's new opinion was not an abuse of discretion.

{¶ 58} At his discovery deposition and at trial, Dr. Rotbart stated that Tara had developed meningitis within a 12– to 24–hour period prior to her admission to

---

**34.** Evid.R. 403(B).

**35.** See *State v. Lewis* (1990), 70 Ohio App.3d 624, 638, 591 N.E.2d 854.

**36.** See *O'Connor v. Cleveland Clinic Found.*, 161 Ohio App.3d 43, 2005-Ohio-2328, 829 N.E.2d 350, ¶ 27.

Children's Hospital. But at trial he added that he thought it was more probable that the time of genesis was closer to 12 hours than to 24 because Tara had been able to sit up in her high chair and eat some of her lunch about eight hours prior to her hospital admission. He explained that when he had given his deposition testimony, he was not aware of Tara's lunchtime activity.

{¶ 59} The discovery rules are designed to eliminate the surprise of undisclosed expert opinions at trial.[37] A party is required to provide opposing counsel "with updated and complete discovery regarding the substance of expert testimony."[38] The defense violated the rules when it did not notify the Fehren-bachs of the additional opinion of Dr. Rotbart. But the additional opinion did not inject a new theory into the case or contradict the earlier opinion that Tara did not have meningitis when O'Malley last saw her 36 hours prior to her admission to Children's Hospital. For this reason, we cannot say that the trial court's failure to strike the opinion was a clear abuse of discretion that materially prejudiced the Fehrenbachs.[39] The assignment of error is overruled.

{¶ 60} The tenth assignment of error alleges that the trial court erred in not granting a new trial or in entering a judgment notwithstanding the verdict, because the jury's verdict was against the weight of the evidence. Based upon our resolution of the first, third, and fourth assignments of error, this assignment is moot and need not be addressed.[40]

## Timeliness of Loss of Consortium Claim

{¶ 61} In the fifth assignment of error, which we address last, the Fehrenbachs argue that the trial court erred in granting partial summary judgment against them on their parental claim for loss of consortium and medical expenses. The court ruled that the claim was time-barred. We hold that since the parental claim was filed along with the primary malpractice claim within the time period prescribed for filing the malpractice claim, the parental claim was timely. The trial court's decision holding otherwise was erroneous as a matter of law.

---

37. *Shumaker v. Oliver B. Cannon & Sons, Inc.* (1986), 28 Ohio St.3d 367, 370, 28 OBR 429, 504 N.E.2d 44.

38. Id.

39. See *Hofmeier v. Cincinnati Inst. of Plastic and Reconstructive Surgery* (Jan. 18, 2002), 1st Dist. No. C–000274, 2002 WL 63432, ¶ 3–8; *Faulk v. Internatl. Business Machines Corp.* (Sept. 7, 2001), 1st Dist. Nos. C–000765 and C–000778, 2001 WL 1020749.

40. App.R. 12(A)(1)(c).

{¶ 62} We have held in *Loudin v. Mills*[41] that the limitations period for a parent's derivative claim is tolled during the child's minority. Although other districts have held otherwise, for the reasons that follow, we remain convinced of *Loudin's* soundness and adhere to its holding.

{¶ 63} On January 25, 1997, almost six years and four months after their claims had accrued, the Fehrenbachs filed a malpractice claim on behalf of Tara. Additionally, they filed their own claim for loss of consortium and medical expenses. A one-year statute of limitations governed all the claims.[42]

{¶ 64} Under the tolling provisions of R.C. 2305.16, "if a person entitled to bring any action * * * is, at the time the cause of action accrues, within the age of minority or of unsound mind, the person may bring it within the respective time[ ] * * * after the disability is removed. When the interests of two or more parties are joint and inseparable, the disability of one shall inure to the benefit of all."

{¶ 65} There is no question that the malpractice claim on behalf of Tara was timely filed. There is also no question that the parental claim was derivative of the malpractice claim—it arose out of the same allegedly tortious act that injured Tara. But the injuries to the parents were separate and distinct, and so the single alleged wrong gave rise to two separate and distinct claims: one on behalf of Tara for her personal injuries and one in favor of her parents for the loss of Tara's consortium and her medical expenses.[43]

{¶ 66} The tolling provisions specifically apply where the interests of a minor and another party are "joint and inseparable." Common sense dictates that the interests of Tara and her parents were "joint and inseparable," even though their claims were "separate and distinct." Tara's parents could not recover for their losses unless it was proved that O'Malley had negligently treated Tara, and the statute of limitations for each claim began to run on the same date.[44] The Ohio Rules of Civil Procedure dictate the same result: joinder of the malpractice claim and the parental claim was compulsory.[45] Therefore, if we were to hold that the

---

41. (May 12, 2000), 1st Dist. No. C–990569, 2000 WL 569569.

42. R.C. 2305.11(B)(1), now codified at R.C. 2305.113, effective April 11, 2003. 2002 Am.Sub. S.B. No. 281.

43. See *Whitehead v. Gen. Tel. Co.* (1969), 20 Ohio St.2d 108, 49 O.O.2d 435, 254 N.E.2d 10, paragraph three of the syllabus.

44. See *Hershberger v. Akron City Hosp.* (1987), 34 Ohio St.3d 1, 516 N.E.2d 204, paragraph two of the syllabus.

45. Civ.R. 19.1(A)(1)(3).

tolling provisions did not inure to the benefit of the Fehrenbachs under these circumstances, then Tara would logically lose the benefit of the same provision.

{¶ 67} The Ohio Supreme Court in *Coleman v. Sandoz Pharmaceuticals Corp.*[46] has suggested that the benefit of the R.C. 2305.16 tolling provisions could be limited in an opposite scenario: where a child files a consortium claim separate from an injured parent's claim. In response to a federal district court's certified request for instruction on state law, *Coleman* held that a child's derivative loss-of-consortium claim should be joined with the parent's claim where feasible, presumably at the expense of the tolling provisions.[47] The court stressed the importance of joining the claims to avoid piecemeal litigation and to encourage the settlement of all claims at the same time. In this case, allowing the tolling provisions to inure to the benefit of the Fehrenbachs would allow for the joinder of their claim with the claim on behalf of Tara, but not at the expense of losing the benefit of the tolling provisions for the primary malpractice claim. Since the parental claim was only derivative, it makes sense to allow the Fehrenbachs to follow the lead of Tara's malpractice claim for statute-of-limitations purposes.

{¶ 68} We are aware of the policies supporting the enforcement of statutes of limitation, such as promoting the prompt prosecution of claims, preventing stale and fraudulent claims, and limiting the burden and anxiety associated with threatened litigation.[48] But those concerns do not weigh heavily here, as the defendants in a lawsuit to remedy a personal injury to a minor were already facing liability due to the primary malpractice claim.

{¶ 69} The purpose of the tolling statute is to protect the interests of minors by preserving their right to recover for wrongs inflicted against them. The statute recognizes the difficulty in pursuing a claim based upon an injury to a minor, as many children cannot "recognize or articulate physical problems." [49]

{¶ 70} In light of the foregoing, we maintain our position that the tolling provisions of R.C. 2305.16 inure to the benefit of parents pursuing a claim for loss of consortium and medical expenses. We hold that the parental claim in this case was timely because it was filed along with the primary malpractice claim within the time period prescribed for filing the malpractice claim. Accordingly, the fifth assignment of error is sustained.

---

46. (1996), 74 Ohio St.3d 492, 660 N.E.2d 424.

47. Id. at 494, 660 N.E.2d 424.

48. See *O'Stricker v. Jim Walter Corp.* (1983), 4 Ohio St.3d 84, 88, 4 OBR 335, 447 N.E.2d 727.

49. *Mominee v. Scherbarth* (1986), 28 Ohio St.3d 270, 275, 28 OBR 346, 503 N.E.2d 717.

{¶ 71} In conclusion, we sustain the Fehrenbachs' first, third, fourth, and fifth assignments. We reverse the trial court's judgment and remand the cause for a new trial both on the malpractice claim and on the parental claim for loss of consortium and medical costs.

Judgment reversed
and cause remanded.

PAINTER, P.J., and SUNDERMANN, J., concur.