STRASEL, Appellee and Cross–Appellant,

v.

SEVEN HILLS OB–GYN ASSOCIATES, INC., d/b/a Seven Hills Women's Health Centers, et al., Appellants and Cross–Appellees.

[Cite as *Strasel v. Seven Hills OB–GYN Assoc., Inc.,* 170 Ohio App.3d 98, 2007-Ohio-171.]

Court of Appeals of Ohio,
First District, Hamilton County.

Nos. C–050341 and C–050364.

Decided Jan. 19, 2007.

---

**36.** Id. at ¶ 16.

Finney, Stagnaro, Saba & Klusmeier Co., L.P.A., and Peter A. Saba, for appellee and cross-appellant.

Triona, Calderhead & Lockemeyer, Ltd., David C. Calderhead, and Joel L. Peschke, for appellants and cross-appellees.

---

Per Curiam.

{¶ 1} On December 13, 2001, plaintiff-appellee and cross-appellant, Christina Strasel, went to defendants-appellants and cross-appellees, Seven Hills OB–GYN Associates, Inc., d.b.a. Seven Hills Women's Health Centers, and Seven Hills Obstetrics and Gynecology Associates, Inc. ("Seven Hills") for an initial pregnancy appointment. Strasel, who was obese, had a history of irregular menstrual

cycles, and the date of her last cycle was undetermined. Strasel was the mother of two children, the oldest of which had been born with a birth defect.

{¶ 2} The Seven Hills midwife scheduled Strasel for a sonogram on December 27, 2001, to confirm her due date. The sonogram showed a sac in Strasel's uterus, but the sonographer could not detect a heart beat or a fetal pole. The sonographer's report stated that she suspected a blighted ovum, a condition in which an empty placental sac develops in the uterus without a fetus. The report also stated that because of Strasel's obesity, the sonographer's ability to see was "limited." The sonographer stated in her report, "I think a follow-up sonogram should be done." Seven Hills's midwife told Strasel that it appeared that she did not have a viable pregnancy. Strasel was told to go home and that she would be contacted later.

{¶ 3} Defendant-appellant and cross-appellee Dr. Xavier G. Ortiz was given Strasel's medical file, including the sonographer's report and still photographs of the sonogram, to review. Dr. Ortiz saw an irregular tear-shaped gestational sac that apparently was without a fetal pole or a heartbeat. Dr. Ortiz diagnosed Strasel with a blighted ovum. Dr. Ortiz knew that Strasel was obese and that Strasel's body size had resulted in the sonographer's "limited ability to see." Dr. Ortiz knew that the sonographer had recommended a second sonogram. He also knew that there was a "great disparity" regarding the gestational age of Strasel's baby and that she had a history of irregular menstrual cycles. Dr. Ortiz did not examine Strasel.

{¶ 4} Dr. Ortiz had the Seven Hills surgery scheduler reserve a time for Strasel to undergo a dilatation and curettage ("D & C") procedure the following morning. In a D & C procedure, the cervix is opened, a suction device is placed in the uterus, and the contents of the uterus are suctioned out. Any tissue adhering to the uterine wall is "combed out," and the uterus is aspirated to remove any remaining contents. A D & C procedure is essentially the same as an abortion procedure. Dr. Ortiz did not order a follow-up sonogram or blood tests to confirm whether Strasel was pregnant.

{¶ 5} Strasel was contacted by the Seven Hills midwife, who told Strasel that she was not pregnant and that Dr. Ortiz wanted to talk to her about a D & C. Before Dr. Ortiz spoke to Strasel, she was contacted by an anesthesiologist from Mercy Hospital Anderson to discuss the surgery, which had been scheduled for the next day. Later that day, Strasel and her husband, plaintiff Daniel Strasel, met with Dr. Ortiz to discuss the D & C procedure. Strasel stated that when she questioned Dr. Ortiz about his diagnosis of a blighted ovum, he stated that he was certain of her condition. Dr. Ortiz never informed Strasel that the sonographer had recommended another sonogram or that other blood tests could confirm her pregnancy. Strasel stated that Dr. Ortiz told her it was difficult to schedule

surgeries and that waiting could endanger her health. Strasel consented to a D & C, which Dr. Ortiz performed the next day.

{¶ 6} For weeks after her surgery, Strasel experienced bleeding, discomfort, pain, cramping, and nausea. Strasel also began to suffer emotionally. Seven weeks after her surgery, Strasel still believed that she was pregnant, and she made an appointment at Seven Hills. After a positive blood test, Strasel was scheduled for a sonogram. The sonographer told Strasel that the sonogram revealed a 13–week–old fetus. Subsequently, Dr. Ortiz told Strasel that he had misdiagnosed her viable pregnancy as a blighted ovum. Strasel was told that the problems and complications that her baby might suffer as a result of the D & C procedure were unknown.

{¶ 7} Strasel transferred her prenatal care to Dr. Patrick Marmion. Strasel consulted with a perinatologist to determine what problems her baby might have due to the D & C. Strasel underwent a series of 11 additional sonograms to monitor her baby's progress. Strasel learned that the D & C posed a serious risk of injury to her baby, and that it was impossible to determine what loss of limb or neurological problems the D & C might have caused until after the baby was born.

{¶ 8} Throughout the balance of her pregnancy, Strasel suffered from panic attacks related to her unrelenting fear of the harm that the D & C might have caused to her baby. She had nightmares, and she was unable to function on a day-to-day basis. Strasel withdrew from her children, and she was unable to care for them as she had in the past. Strasel worried constantly about the condition of her unborn child. Strasel and her husband separated. She sought psychological treatment from a Dr. Reed and a Dr. Thompson.

{¶ 9} Strasel delivered a healthy baby girl. But her fears for the baby's health did not subside. Strasel worried constantly about whether the baby would develop neurological problems. She had panic attacks. Strasel's anxiety caused her to fear that her baby might develop cystic fibrosis, and she continually licked the child's face to determine whether her skin was salty, because Strasel understood that salty skin was a symptom of cystic fibrosis.

{¶ 10} Psychologist Dr. Paul Deardorff examined and tested Strasel. Dr. Deardorff opined that Strasel suffered from major depressive disorder and post-traumatic stress disorder, both of which had resulted from the D & C procedure and the uncertainty about how it would affect her child. Dr. Deardorff stated at trial that Strasel required six to nine months of additional psychological treatment.

{¶ 11} Strasel and her husband filed suit for malpractice and negligent infliction of emotional distress. Strasel also requested punitive damages. The

case was referred to arbitration, where Strasel was awarded $210,000. Dr. Ortiz and Seven Hills appealed the arbitration award. The trial court directed a verdict in favor of Dr. Ortiz and Seven Hills on Strasel's claim for punitive damages. Following a trial, the jury returned a verdict of $372,000 in Strasel's favor. The jury found against Strasel's husband on his claims. Dr. Ortiz and Seven Hills filed motions for a new trial, for judgment notwithstanding the verdict or, in the alternative, for remittitur, which the trial court denied. Strasel filed a motion for prejudgment interest, which the trial court denied after a hearing.

{¶ 12} Dr. Ortiz and Seven Hills have appealed under case number C–050341 from the entry of judgment on the jury's verdict and from the trial court's judgment denying their post-trial motions. Strasel has filed a cross-appeal under case number C–050364 from the trial court's rulings denying her prejudgment interest and punitive damages.

{¶ 13} For their first assignment of error, Dr. Ortiz and Seven Hills allege that the trial court erred in allowing Strasel to file a claim for, present evidence of, and recover damages for psychological harm and emotional injuries that arose from the fear of a "non-existent peril." Dr. Ortiz and Seven Hills argue that because Strasel delivered a healthy baby, she could not recover for major depressive disorder and post-traumatic stress disorder based upon her fear for the baby's well-being.

{¶ 14} In *Heiner v. Moretuzzo*,[1] the Ohio Supreme Court held that a plaintiff may not recover for negligent infliction of emotional distress "where the defendant's negligence produced no actual threat of physical harm to the plaintiff or any other person." Heiner had been incorrectly told by health professionals that she had tested positive for HIV. After learning that she was HIV-negative, Heiner sued her physician for the emotional distress she had suffered as a result of the incorrect diagnosis. The Ohio Supreme Court held that Heiner could not recover on her claim for negligent infliction of emotional distress because she was not HIV–positive, and, therefore, her distress had been caused by a nonexistent peril.

{¶ 15} This court followed *Heiner* in *Vogelsang v. Hwa–Shain Yeh*,[2] holding that the plaintiff could not recover for negligent infliction of emotional distress where there was no showing that a bone graft the plaintiff had received was contaminated by the AIDS virus. All of Vogelsang's blood tests were negative,

---

1. (1995), 73 Ohio St.3d 80, 652 N.E.2d 664.

2. (Nov. 15, 1995), 1st Dist. No. C–940793, 1995 WL 675991.

and there was no evidence to indicate that she had been exposed to the AIDS virus.

{¶ 16} In *Williams v. Warren Gen. Hosp.*,[3] the plaintiff was denied recovery for negligent infliction of emotional distress where the initial diagnosis of cancer proved to be incorrect.

{¶ 17} The Ohio Supreme Court held in *Dobran v. Franciscan Med. Ctr.*[4] that the unfounded fear of metastasis of cancer cannot be the basis of a claim for negligent infliction of emotional distress. Dobran's sentinel lymph nodes had consistently tested negative for metastasis. One portion of the lymph nodes had thawed before it reached its intended destination for more testing. The court pointed out that Dobran had not contracted cancer as a result of the defendant's negligence in allowing the sample to thaw and that if his cancer returned, it would not be because the defendant had placed Dobran in any physical harm.

{¶ 18} We point out that none of the plaintiffs in any of the foregoing cases cited by Ortiz and Seven Hills were placed in any real danger by the alleged negligence of the defendants. Further, the alleged negligence of the defendants did not place any other person in real or impending physical danger. In this case, Strasel's baby was placed in actual physical peril by Ortiz's misdiagnosis and performance of the D & C.

{¶ 19} In *Paugh v. Hanks*,[5] the Ohio Supreme Court held that a mother had an actionable claim for negligent infliction of emotional distress where she was subjected to severe psychological harm due to three separate incidents in which a car had crashed into her house or yard, causing her to fear for the lives of her children. *Paugh* stated, "[A] cause of action for the negligent infliction of serious emotional distress may be stated where the plaintiff-bystander reasonably appreciated the peril which took place, whether or not the victim suffered actual physical harm, and, that as a result of this cognizance or fear of peril, the plaintiff suffered severe emotional distress."[6]

{¶ 20} A father who feared that his daughter might have contracted AIDS when she stepped on a needle contaminated with blood from an unknown person and was told to return for a series of blood tests to determine whether she had

---

3. (1996), 115 Ohio App.3d 87, 684 N.E.2d 730.

4. 102 Ohio St.3d 54, 2004-Ohio-1883, 806 N.E.2d 537.

5. (1983), 6 Ohio St.3d 72, 6 OBR 114, 451 N.E.2d 759.

6. See id.

been exposed to HIV fell "squarely into the class of persons discussed by the *Paugh* court," because he was a bystander to his daughter's injury.[7]

{¶ 21} A wife and daughter who tested positive for tuberculosis and who had been exposed to tuberculosis through the decedent, who had contracted the disease in his employment, stated a cause of action against the decedent's employer for negligent infliction of emotional distress even though they had not developed an active form of the disease, because a reasonable jury could have concluded that the employer had negligently inflicted emotional distress on the plaintiffs by causing them to fear the development of active tuberculosis. The wife and daughter had been exposed to a real danger even though the disease had not become active.[8]

{¶ 22} In this case, Strasel was clearly present when the D & C was performed. It is uncontroverted that her baby was subjected to a real physical peril by the D & C, regardless of whether the peril led to an actual injury. Strasel's emotional distress resulted from the very real risk of injury to a seven-week-old fetus subjected to what was the equivalent of an abortion procedure. The fact that the baby was born without any apparent physical injury did not alter the fact that the D & C had subjected the baby to a very real danger. Strasel clearly appreciated the risk to her baby, and as a result of her recognition of the peril, she suffered psychological injuries that were compensable under *Paugh*. The first assignment of error is overruled.

{¶ 23} The second assignment of error, which alleges that the trial court erred in allowing Strasel's expert psychologist, Dr. Deardorff, to give unqualified testimony about the presence of birth defects in Strasel's child, is overruled. Dr. Deardorff testified exclusively about Strasel's psychological injuries. The references to the health of the child and the numerous trips to the emergency room were clearly elicited to show how Strasel's psychological problems manifested themselves. The testimony was not offered to show that the baby might experience any problem in the future. No claims were made for any future damages on behalf of the baby, and no such damages were awarded.

{¶ 24} The third assignment of error alleges that the trial court erred in allowing Dr. Deardorff to give "new undisclosed opinions at trial." Dr. Ortiz and Seven Hills argue that Dr. Deardorff's testimony about the many times Strasel had taken her baby to the emergency room and her fear that the child might develop cystic fibrosis constituted new undisclosed opinions. We disagree. As

---

7. See *Galland v. Meridia Health Sys., Inc.,* 9th Dist. No. C.A. 23163, 2006-Ohio-4867, 2006 WL 2686550.

8. See *Padney v. MetroHealth Med. Ctr.* (2001), 145 Ohio App.3d 759, 764 N.E.2d 492.

we pointed out under the second assignment of error, Dr. Deardorff's testimony was elicited to show how Strasel's psychological problems manifested themselves. Dr. Deardorff's opinions regarding Strasel's psychological problems, the cause of those problems, and her need for future treatment were entirely consistent with his deposition testimony. Dr. Deardorff stated that his examination of Strasel in October 2004 confirmed his prior opinions about Strasel's emotional distress. His testimony did not inject a new theory into the case. The subject matter of Dr. Deardorff's opinions never changed, and Dr. Ortiz and Seven Hills could not have been surprised by the substance of his testimony.[9] The third assignment of error is overruled.

{¶ 25} The fourth assignment of error alleges that the trial court erred in admitting the expert testimony of Dr. Marmion, Strasel's treating physician, because Strasel did not establish that Dr. Marmion had devoted at least one half of his professional time to a qualifying activity pursuant to Evid.R. 601(D). Evid. R. 601(D) requires that an expert witness in a medical malpractice case devote "at least one-half of his or her professional time to the active clinical practice in his or her professional field of licensure, or to its instruction in an accredited school." The purpose of the rule is to preclude testimony from physicians who are "professional witnesses."[10] The trial court's decision regarding the competency of an expert witness will not be reversed absent an abuse of discretion.[11]

{¶ 26} The record reveals that Dr. Marmion was board certified in obstetrics and gynecology, as well as in preventative medicine; he was licensed to practice medicine in Ohio, California, and Washington; he was currently employed by the state of Washington at the Southwest Washington Medical Center as a consultant in obstetrics and gynecology for the Healthy Steps Prenatal Clinic; he had an appointment with the University of Washington Family Medicine Residency program; he previously had been engaged in private practice for 15 years in Cincinnati and Batavia; he had held clinical appointments at various hospitals in Cincinnati, including Good Samaritan, Christ, Jewish, Mercy Anderson, Mercy Fairfield, and Clermont Mercy; he had been Strasel's treating physician; from 1993 through 2003, he had been the administrator and clinician for Healthy Beginnings, Inc., a private nonprofit organization; and he had been an obstetrics and gynecology instructor at Good Samaritan and Bethesda hospitals. These

---

9. See *Fehrenbach v. O'Malley*, 164 Ohio App.3d 80, 2005-Ohio-5554, 841 N.E.2d 350; *Hofmeier v. Cincinnati Inst. of Plastic & Reconstructive Surgery, Inc.*, 1st Dist. No. C–000274, 2002-Ohio-188, 2002 WL 63432; *Faulk v. Internatl. Business Machines Corp.* (Sept. 7, 2001), 1st Dist. Nos. C–000765 & C–000778, 2001 WL 1020749.

10. See *McCrory v. State* (1981), 67 Ohio St.2d 99, 21 O.O.3d 63, 423 N.E.2d 156.

11. See id.

facts supported the trial court's finding that Dr. Marmion was sufficiently involved in active clinical practice and/or teaching within the meaning of Evid.R. 601(D).[12] We hold that the trial court did not abuse its discretion in permitting Dr. Marmion's testimony. The fourth assignment of error is overruled.

{¶ 27} For their fifth assignment of error, Dr. Ortiz and Seven Hills essentially allege that the trial court erred in overruling their motion for a new trial because the jury's verdict was against the manifest weight of the evidence and because the damages awarded were excessive and/or were awarded under the influence of passion and prejudice.

{¶ 28} Following a review of the record, we hold that the trial court did not abuse its discretion in overruling the motion for a new trial on the basis that the jury's verdict was against the manifest weight of the evidence, because the verdict was supported by substantial competent, credible evidence.[13]

{¶ 29} Dr. Ortiz and Seven Hills also argue that the trial court abused its discretion in overruling the motion for a new trial based upon the jury's award of excessive damages that were influenced by passion and prejudice. Damages are an issue within the province of the jury.[14] In this case, the trial court was in the best position to determine whether the award was so excessive that it must have been the result of passion and prejudice.[15] The burden was on Dr. Ortiz and Seven Hills to demonstrate that passion and prejudice played a role in the jury's determination.[16] To support a finding of passion and prejudice, it must be demonstrated that the jury's assessment of damages was so overwhelmingly disproportionate as to shock reasonable sensibilities.[17]

{¶ 30} We find no indication in the record that the jury was influenced by passion and prejudice. The record contains substantial evidence to support the jury's damage award. The trial court did not abuse its discretion in overruling

---

12. See *Siuda v. Howard*, 1st Dist. Nos. C–000656 & C–000687, 2002-Ohio-2292, 2002 WL 946188.

13. See *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 10 OBR 408, 461 N.E.2d 1273; *Smith v. Sass, Friedman & Assocs., Inc.*, 8th Dist. No. 81953, 2004-Ohio-494, 2004 WL 229515.

14. See *Larrissey v. Norwalk Truck Lines, Inc.* (1951), 155 Ohio St. 207, 44 O.O. 238, 98 N.E.2d 419.

15. See *Villella v. Waikem Motors, Inc.* (1989), 45 Ohio St.3d 36, 543 N.E.2d 464.

16. See *Knor v. Parking Co. of Am.* (1991), 73 Ohio App.3d 177, 596 N.E.2d 1059.

17. See *Pena v. Northeast Ohio Emergency Affiliates* (1995), 108 Ohio App.3d 96, 670 N.E.2d 268.

the motion for a new trial based on excessive damages. The fifth assignment of error is overruled.

{¶ 31} In her cross-appeal, Strasel raises two assignments of error for our review. Strasel's first assignment of error alleges that the trial court erred in denying her motion for prejudgment interest because Dr. Ortiz and Seven Hills had not made a good-faith effort to settle the case.

{¶ 32} R.C. 1343.03(C)(1) provides, "If, upon motion of any party to a civil action that is based on tortious conduct, that has not been settled by agreement of the parties, and in which the court has rendered a judgment, decree, or order for the payment of money, the court determines at a hearing held subsequent to the verdict or decision in the action that the party required to pay the money failed to make a good faith effort to settle the case and that the party to whom the money is to be paid did not fail to make a good faith effort to settle the case, interest on the judgment, decree, or order shall be computed[.]"

■■■ {¶ 33} "A party has not 'failed to make a good faith effort to settle' under R.C. 1343.03(C) if he has (1) fully cooperated in discovery proceedings, (2) rationally evaluated his risks and potential liability, (3) not attempted to unnecessarily delay any of the proceedings, and (4) made a good faith monetary settlement offer or responded in good faith to an offer from the other party. If a party has a good faith, objectively reasonable belief that he has no liability, he need not make a monetary settlement offer."[18] Whether a party has a good-faith objective belief that he has no liability must be strictly construed so as to carry out the purposes of R.C. 1343.03(C), which are to "promote settlement efforts, to prevent parties who have engaged in tortious conduct from frivolously delaying the ultimate resolution of cases, and to encourage good faith efforts to settle controversies outside a trial setting."[19]

■■■ {¶ 34} Under R.C. 1343.03(C), the phrase "failed to make a good faith effort to settle" does not mean "bad faith."[20] A party may have failed to make a good-faith effort to settle even though he or she did not act in bad faith.[21] Whether a good-faith effort to settle a case has been made depends on whether

18. See *Kalain v. Smith* (1986), 25 Ohio St.3d 157, 25 OBR 201, 495 N.E.2d 572.

19. See *Moskovitz v. Mt. Sinai Med. Ctr.* (1994), 69 Ohio St.3d 638, 635 N.E.2d 331, citing *Kalain v. Smith*, supra.

20. See id.

21. See id.

the amount of the settlement offer was based on an objectively reasonable belief about the party's liability and a rational evaluation of the risk of exposure.[22]

{¶ 35} One factor demonstrating whether a party has made a good-faith effort to settle is the disparity between the settlement offer and the amount of the jury verdict.[23] The insurance representative handling the claim for Dr. Ortiz and Seven Hills testified that the highest settlement offer made was $10,000. He also testified that it was his understanding that Strasel was "not interested" in settling for "less than six figures." Strasel had been awarded $210,000 in the arbitration. In response to the $10,000 offer, Strasel stated that she would be willing to accept $205,000, and that she would be willing to consider any offer made in good faith. The $210,000 arbitration award should have apprised Dr. Ortiz and Seven Hills that a verdict for Strasel was possible, if not probable.[24] The jury ultimately returned a $372,000 verdict in favor of Strasel.

{¶ 36} An award of prejudgment interest is proper when "a defendant 'just says no' despite a plaintiff's presentation of credible, medical evidence that the defendant physician fell short of the standard of professional care required of him, when it is clear that the plaintiff has suffered injuries, and when the causation of those injuries is arguably attributable to the defendant's conduct." [25]

{¶ 37} The record shows that Dr. Ortiz and Seven Hills failed to rationally evaluate and assess the risks of potential liability. We hold, as a matter of law, that the trial court should have awarded Strasel prejudgment interest and that the court's failure to award prejudgment interest was an abuse of discretion. Strasel's first assignment of error is sustained. This cause must be remanded for a determination of the amount of prejudgment interest to be awarded to Strasel.

{¶ 38} Strasel's second assignment of error alleges that the trial court erred in granting the motion of Dr. Ortiz and Seven Hills for a directed verdict with respect to Strasel's claim for punitive damages.

{¶ 39} When ruling on a motion for a directed verdict, the trial court must construe the evidence most strongly in favor of the nonmoving party.[26] To

22. See *Andre v. Case Design, Inc.*, 154 Ohio App.3d 323, 2003-Ohio-4960, 797 N.E.2d 132.

23. See id.

24. See *Champ v. Wal–Mart Stores, Inc.*, 1st Dist. No. C–010283, 2002-Ohio-1615, 2002 WL 440751.

25. See *Galayda v. Lake Hosp. Sys., Inc.* (1994), 71 Ohio St.3d 421, 644 N.E.2d 298.

26. See *Stojkovic v. Avery & Thress, M.D., Inc.* (May 28, 1999), 1st Dist. No. C–970279, 1999 WL 334863, citing *Ruta v. Breckenridge–Remy Co.* (1982), 69 Ohio St.2d 66, 23 O.O.3d 115, 430 N.E.2d 935.

recover punitive damages, Strasel had to prove by clear and convincing evidence that Dr. Ortiz's actions demonstrated malice.[27]  Malice is defined as behavior characterized by hatred, ill will, or a spirit of revenge, or a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm.[28]  We hold that Dr. Ortiz's conduct in this case did not rise to the level of malice required for an award of punitive damages.  Strasel's second assignment of error is overruled.

{¶ 40} The judgment of the trial court denying Strasel's motion for prejudgment interest is reversed, and the cause is remanded for a determination of the amount of prejudgment interest to be awarded to Strasel.  The trial court's judgment is affirmed in all other respects.

> Judgment affirmed in part
> and reversed in part,
> and cause remanded.

SUNDERMANN and HENDON, JJ.

Judge RUPERT A. DOAN was a member of the panel, but died before the release of this decision.

---

27.  See id.; *Siuda v. Howard,* 2002-Ohio-2292.

28.  See *Preston v. Murty* (1987), 32 Ohio St.3d 334, 512 N.E.2d 1174.