ANDRE et al., Appellants,

v.

CASE DESIGN, INC. et al., Appellees.

[Cite as *Andre v. Case Design, Inc.,* 154 Ohio App.3d 323, 2003-Ohio-4960.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–020800.

Decided Sept. 19, 2003.

Dinsmore & Shohl, LLP, Mark A. Vander Laan and Bryan E. Pacheco, for appellants.

Rendigs, Fry, Kiely & Dennis, LLP, and Kenneth B. Flacks, for appellee Ewing United Company.

Droder & Miller Co., L.P.A., Bradley A. Powell and Jeffrey T. Kenney, for appellee Case Design, Inc.

---

Gorman, Judge.

{¶ 1} The plaintiffs-appellants, J. Richard and Margaret Ann Gilman Andre, appeal from the trial court's judgment of December 16, 2002, denying their motion for prejudgment interest, pursuant to R.C. 1343.03(C), after a jury had awarded them $715,000 in damages for personal injuries and loss of consortium. Because the trial court's understanding of the parties' settlement negotiations was fundamentally flawed, we hold that it abused its discretion when it overruled the Andres' motion for prejudgment interest.

## FACTS

{¶ 2} In May 1993, the Andres purchased a condominium unit for $645,000 from defendant-appellee Ewing United Company, the owner and developer of the Edge Cliff Point Condominiums. As the general contractor and supervisor for the construction of the condominiums, Ewing recommended to the Andres that defendant-appellee Case Design, Inc., install the kitchen cabinets in their unit. On September 17, 1998, a 150–pound cabinet installed by Case on the kitchen wall, containing approximately 120 pounds of cookbooks, fell and pinned Mrs. Andre underneath. Case admitted that the screws anchoring the cabinet fractured because they were the wrong type and because six screws had been used instead of the proper eighteen. Mrs. Andre, who was then sixty-nine years of age, sustained three crushed vertebrae and a fractured elbow. She was initially hospitalized for twenty-nine days.

{¶ 3} On September 5, 2000, the Andres filed their complaint for the personal injuries suffered by Mrs. Andre, claiming that they were caused by Case and Ewing's negligence. They also asserted claims for loss of consortium and negligent infliction of emotional distress. Trial commenced two years later on September 3, 2002. The jury thereafter returned a unanimous verdict for the Andres in the sum of $715,000, finding that Case and Ewing were jointly and severally liable. Specifically, the jury awarded Mrs. Andre $85,000 for past medical expenses; $250,000 for past pain and suffering; $120,000 for past loss of enjoyment of life; $60,000 for future medical expenses; $50,000 for future pain and suffering, and $50,000 for future loss of enjoyment of life. The jury also awarded Mr. Andre $75,000 for loss of consortium and $25,000 for negligent infliction of emotional distress. Five days later, Westfield Insurance Company, Case's insurance carrier, paid the judgment in full.

{¶ 4} On September 20, 2002, the Andres filed a post-trial motion for prejudgment interest. After an evidentiary hearing, the trial court overruled the motion in a written decision captioned "Judgment Entry." The reasons given for denying prejudgment interest were as follows: "The Court finds that just prior to the start of the case, on the first day of trial, the demand of plaintiffs of $2,000,000.00 was reduced to a demand of $1,200,000.00 at which time the defendants raised their offer of $250,000.00 to $300,000.00. These were the last offer and demand made by the parties. Plaintiffs argued at the prejudgment interest hearing that the drop in formal demand from two million to one million two hundred thousand dollars 'signaled' plaintiffs' true position to defendants, being that a settlement could be reached at the middle ground, i.e., $750,000. This argument raises the question, 'must defendants read the *unexpressed "signals"* of plaintiffs in order to negotiate in good faith?' The answer is an emphatic 'No!' "

{¶ 5} In a single assignment of error, the Andres now contend that the trial court abused its discretion in denying their motion for prejudgment interest. They argue that they were entitled to prejudgment interest because Case and Ewing did not negotiate in good faith by failing to rationally evaluate and assess the risk of their potential liability.

## PREJUDGMENT INTEREST

{¶ 6} R.C. 1343.03(C) states, "Interest on a judgment, decree, or order for the payment of money rendered in a civil action based on tortious conduct and not settled by agreement of the parties, shall be computed from the date the cause of action accrued to the date on which the money is paid if, upon motion of any party to the action, the court determines at a hearing held subsequent to the verdict or decision in the action that the party required to pay the money failed to make a good faith effort to settle the case and that the party to whom the money is to be paid did not fail to make a good faith effort to settle the case."

{¶ 7} The award of prejudgment interest encourages the "settlement of meritorious claims, and the compensation of a successful party for losses suffered as the result of the failure of an opposing party to exercise good faith in negotiating a settlement." *Lovewell v. Physicians Ins. Co. of Ohio* (1997), 79 Ohio St.3d 143, 147, 679 N.E.2d 1119; see, also, *Kalain v. Smith* (1986), 25 Ohio St.3d 157, 159, 25 OBR 201, 495 N.E.2d 572. Therefore, an injured party in a tort action is, under appropriate circumstances, entitled to recover interest from the date the cause of action accrues.

{¶ 8} For purposes of prejudgment interest, a lack of "good faith" is not the equivalent of "bad faith." See *Kalain v. Smith*, 25 Ohio St.3d at 159, 25 OBR 201, 495 N.E.2d 572. The Ohio Supreme Court has held that a trial court should not award prejudgment interest where the tortfeasor (1) fully cooperated in discovery, (2) rationally evaluated risks and potential liability, (3) did not attempt to delay the proceedings unnecessarily, and (4) made a good-faith monetary settlement offer or responded in good faith to an offer from the other party. See id., syllabus; see, also, *Champ v. Wal–Mart Stores, Inc.*, 1st Dist. No. C–010283, 2002-Ohio-1615, 2002 WL 440751.

{¶ 9} The burden is on the party seeking prejudgment interest to demonstrate that the tortfeasor failed to make a good-faith effort to settle the case. See *Moskovitz v. Mt. Sinai Med. Ctr.* (1994), 69 Ohio St.3d 638, 659, 635 N.E.2d 331. Whether a party's settlement efforts were made in good faith is a decision committed to the sound discretion of the trial court. See id. at 658, 635 N.E.2d 331. Abuse of discretion connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or

unconscionable. See *Huffman v. Hair Surgeon, Inc.* (1985), 19 Ohio St.3d 83, 87, 19 OBR 123, 482 N.E.2d 1248. Absent an abuse of discretion, the trial court's decision to award prejudgment interest should not be reversed on appeal. See *Kalain v. Smith,* 25 Ohio St.3d at 159, 25 OBR 201, 495 N.E.2d 572.

{¶ 10} In this case, the trial court was under the mistaken notion that the parties had waited until the first day of trial to begin settlement discussions. The correct chronology of the settlement efforts was detailed in the redacted file of the adjuster admitted as an exhibit at the hearing on the Andres' motion for prejudgment interest. It began with the adjuster's assessment and the following notation, dated December 17, 1998: "I feel that with close to a 3 month stay in hospital 2 fx vertebrae, fx elbow and probably 50% liab [sic] at min [sic] that our exposure could reach far in excess of $150,000."

{¶ 11} Affidavits show that settlement discussions between the Andres and Westfield first began in earnest approximately seventeen months before the trial—not on the day of trial as the trial court found. On April 20, 2001, in response to the Andres' $2,000,000 demand, Westfield communicated its first settlement offer of $100,000 to counsel for the Andres. The Andres rejected that offer, but the adjuster noted in his file on February 6, 2002, that counsel had advised that the Andres would have to give "strong consideration to 'something in the half-million-dollar range.' " At the pretrial conference on February 11, 2002, after the trial court had overruled Ewing's motion for summary judgment, the adjuster increased the settlement offer to $250,000.

{¶ 12} Because of a scheduling conflict and the unavailability of a judge, the trial date, originally scheduled at the pretrial conference for February 25, 2002, was continued to September 3, 2002. On July 24, 2002, six weeks before the new trial date, counsel for the Andres, during the supplemental deposition of Mrs. Andre, reduced the Andres' settlement demand to $1,200,000. Counsel also suggested to the adjuster that the Andres "might settle between $700,000 and 800,000."

{¶ 13} On August 27, 2002, in a telephone call to the Andres' counsel, the adjuster again offered $250,000, which counsel rejected. The adjuster then advised that he did not have authority to offer $1,200,000. In his notes, the adjuster stated, "[The Andres' counsel] intimated they had room to move, but suggested case value would need to be at $600–700K range in order to resolve; I intimated that we're valuing at somewhere less than 50% of that amount, notwithstanding that we'd like to see this resolved and have degree of flexibility." The adjuster did tell counsel for the Andres that he had additional settlement authority, but was not willing to put a specific amount on the table if the case could not be settled. The conversation concluded with the understanding that if

further settlement discussions were to take place, counsel for the Andres would contact the adjuster.

{¶ 14} On the second day of trial, the adjuster increased the settlement offer to $300,000. The Andres rejected that offer. On the third day of trial, Case's counsel suggested a "high-low" offer of $1,000,000/$300,000. Under this offer, as defined by the Ohio Supreme Court in *Ziegler v. Wendel Poultry Serv., Inc.* (1993), 67 Ohio St.3d 10, 16, 615 N.E.2d 1022, Case would agree to pay the Andres $300,000 regardless of the amount of the jury's verdict, or up to $1,000,000 if the verdict exceeded $300,000. The Andres countered with a "high-low" of $1,200,000/$500,000. Case's counsel responded with a "high-low" of $1,200,000/$200,000, which the Andres rejected. At no time did Ewing United Co. make a separate offer of settlement.

## FAILURE TO RATIONALLY EVALUATE

■ {¶ 15} The Andres argue that they were entitled to prejudgment interest because Case and Ewing did not negotiate in good faith, as they failed to rationally evaluate and assess the risk of their potential liability. The lack of a good-faith effort to settle is not demonstrated simply by comparing the amount of a settlement offer to the verdict actually returned by a jury. Although a substantial disparity between an offer and a verdict is one factor circumstantially demonstrating whether a party made a good-faith effort to settle or the adverse party failed to do so, without more, the prevailing party has not met its burden of proving its entitlement to prejudgment interest. See *Loder v. Burger* (1996), 113 Ohio App.3d 669, 675, 681 N.E.2d 1357.

■ {¶ 16} The trial court's conclusion that the Andres had given only "unexpressed signals" of a $750,000 settlement demand and had failed to "verbalize their willingness to accept an offer of $750,000 to settle" is contradicted by the evidence in the record. There is no requirement that the prevailing party present evidence of a written demand. A demand may be proved by "something equally persuasive." *Moskovitz v. Mt. Sinai Med. Ctr.*, 69 Ohio St.3d at 659, 635 N.E.2d 331. A determination of a good-faith effort to settle a case requires only a figure capable of an objective evaluation. See *Sindel v. Toledo Edison Co.* (1993), 87 Ohio App.3d 525, 533, 622 N.E.2d 706. In this regard, we have said that a formal demand by the prevailing party is unnecessary if that party responds in good faith to the tortfeasor's offers. See *Parker v. I & F Insulation Co., Inc.* (Mar. 27, 1998), 1st Dist. No. C–960602, 1998 WL 144510.

{¶ 17} The adjuster's file showed that he was aware that $600,000 to $700,000 was the settlement figure that the Andres had in mind. Case's defense counsel had similarly evaluated the case for settlement according to the adjuster's

notation of February 11, 2002, which he reported to his home office: "D/C Value $5–700k, VRDCT $150–2M; STLMNT $3–400k." After the verdict, the adjuster's notation, dated September 10, 2002, stated, "[W]ould have taken something in $600–700k range to get this settled." The adjuster's notes were persuasive evidence that the settlement amounts proposed by counsel for the Andres were more than simply what the trial court characterized as "unexpressed signals."

{¶ 18} The question of whether a good-faith effort to settle a case has been made depends on whether the amount of the offer was based on an objectively reasonable belief. See *Galmish v. Cicchini* (2000), 90 Ohio St.3d 22, 35, 734 N.E.2d 782. Subjective claims of lack of good faith are insufficient. A rational evaluation of the risk of exposure assumes more than simply a defendant's admission of liability. The value of a case for settlement depends on a realistic assessment of defense strategy and tangibles such as the credibility of the opinions of medical experts as to causation, evidence of permanency, the effect of the injury on the plaintiff's quality of life, and the plaintiff's credibility and sincerity as a witness. A substantial six-figure offer is not a rational evaluation if it fails to take into account the strengths and weaknesses of the evidence in assessing the size of an award should a jury discount the defense's evidence.

{¶ 19} Here, the trial court wrongly concluded that because the Andres' formal $1,200,000 demand and Westfield's offer of $300,000 were both "grossly incorrect in evaluations" in relation to the amount of the verdict, there was no showing of a lack of good faith by either party. That approach failed to examine whether the amount of Westfield's offer represented a good-faith effort to settle the case. It assumed that any offer, even an unreasonable offer, became a rational evaluation of the risks.

{¶ 20} Having admitted negligence, the defense was left to claim only that there was no liability after June 1999 for Mrs. Andre's subsequent injuries because they were certain to result from her preexisting osteoporosis. Case's counsel argued that the fracture of Mrs. Andre's pelvis as she was being turned on an x-ray table was proof that any hospital and medical expenses or pain and suffering after that date were the result of her preexisting osteoporosis rather than Case's negligence. Counsel for Case told the jury in closing argument, "[I]f you find these pelvic and thoracic fractures she suffered in May or June of 1999 are not related, then it wouldn't be fair to Mr. Case to be responsible for paying those. * * * It is our position that treatment through May of 1999 is fair and reasonable compensation for medical expenses and that amounts to approximately $50,000." In other words, Case was claiming that Mrs. Andre did not suffer

permanent injuries. The jury rejected that argument, awarding the Andres $85,000 for past hospital and medical expenses and $60,000 for future medical expenses.

{¶ 21} Case's defense strategy was based primarily upon the testimony of its only medical expert, Dr. Angelo Licata, a specialist in endocrinology and osteoporosis employed by the Cleveland Clinic. He did not examine Mrs. Andre, but based his opinion upon his review of her 1995, 1997, and 2000 bone-density scans and her hospital and medical records. Dr. Licata disputed the opinions of Mrs. Andre's treating physicians, Warren Webster, M.D., a specialist in internal medicine, Robert R. Recker, M.D., an internist specializing in osteoporosis, and Alfred Kahn III, M.D., a specialist in orthopaedic surgery, that on August 18, 2000, her osteoporosis was in remission as the result of medication, vitamins, and therapy. But he agreed with the unanimous opinion of her treating physicians that her traumatic fractures on September 18, 1998, aggravated her preexisting osteoporosis, making her more prone to fractures. Dr. Licata also conceded that Mrs. Andre had not returned "to her former state of well-being." Case knew, as early as January 28, 2002, when Dr. Licata was deposed, of its expert's admission that Mrs. Andre's preexisting osteoporosis had been aggravated by the trauma of her injuries.

{¶ 22} The trial transcript of the closing argument, in which Case's counsel adopted a confession-and-avoidance approach, seems to reflect counsel's own doubts about the defense. He told the jury, "This September 17, 1998, accident, ladies and gentlemen, was a horrible accident. And you know what? I'll be the first to tell you that Mrs. Andre deserves significant compensation just for the accident itself, just for the fact that these cabinets, 270 pounds worth of material fell on her. * * * I'm not here to tell you she's healed, she's recovered. She's still bad off, and I acknowledge that * * *."

{¶ 23} In light of the testimony of her treating physicians and the concession of Case's medical expert concerning aggravation of her preexisting osteoporosis, Case and Westfield's defense of denying responsibility for anything after June 1999 was born from a faulty premise. Furthermore, its defense on the issue of damages did not account for the effect of Mrs. Andre's injuries on her enjoyment of life, which, despite her age, was admittedly interrupted and dramatically changed. The evidence was uncontradicted that, before she sustained her injuries, Mrs. Andre had been an active person particularly for her age. Dr. Kahn, who had known her socially for fourteen years, testified that Mrs. Andre was not a complainer, and that, as a result of her injuries, her life had become "nonfunctional." This observation was supported by the unchallenged testimony

of Dr. Kenneth Manges, a clinical, forensic, and vocational psychologist, who diagnosed post-traumatic stress disorder as a result of the September 18, 1998 accident. He concluded that Mrs. Andre's quality of life had been reduced, and that she had become frail and vulnerable as a result of her injuries.

{¶ 24} The evidence also demonstrated that Mr. Andre, in his retirement, had become the full-time caregiver for his wife. Dr. Manges diagnosed Mr. Andre as suffering from depression and anxiety. There was in his opinion a need for marital therapy. Although Case offered no evidence to contradict Dr. Manges's testimony, nowhere is there a suggestion in the record that Mr. Andre's claims for loss of consortium and negligent infliction of emotional distress were considered by Case or Westfield in their settlement evaluation.

{¶ 25} The affidavits showed that Westfield retained the authority to settle the case and continued to negotiate with the Andres through the trial. Although Case's counsel at the hearing on prejudgment interest resolutely fell on his sword, taking full responsibility for any misevaluation, in his affidavit he stated that he "did not have authority, at any time, to bind the Defendant nor the insurance carrier, Westfield, to any particular numbers." Case's counsel informed the court, in chambers on the day of the trial, of his desire that Westfield's adjuster "place on the table the full amount of his authority to settle this case to see if we could get it done." The adjuster did not respond until the second day of trial.

{¶ 26} The adjuster persistently adhered to his initial evaluation of $250,000 to $350,000 for settlement without factoring into the equation how the Andres' lives had changed after September 18, 1998; Case's admission of liability; the $145,000 in provable past and future hospital and medical expenses; the strength and quality of the testimony of Mrs. Andre's treating physicians and psychologist on the permanency of her injuries and the aggravation of her osteoporosis; her vulnerability to future fractures; and the settlement value of the case if, as was likely, the jury was not persuaded by Dr. Licata's testimony. Despite these risks, the adjuster and Westfield continued to adhere rigidly to the adjuster's initial evaluation. Ironically, Westfield's final high-low offer of $1,200,000/$200,000 was in reality a reduction of Case's offer as of the first day of trial.

## EWING'S DEFENSE

{¶ 27} Ewing's denial of liability throughout the trial on the basis that Case was an independent contractor over whom it had no control was patently at odds with its contract with the Andres and the subcontract with Case. Its refusal to

make a settlement offer was apparently driven by the fact that even if the jury held it liable, it was entitled to indemnification from Case. Paragraph E2 in Ewing's contract with the Andres stated, "All work on the condominium and the unit shall be performed by seller through its general contractor and its subcontractors." Its subcontract with Case provided that, as the general contractor, Ewing was to retain control of the project. Ewing participated in the pretrial discovery and the trial, but was content to be a "free rider" for settlement purposes.

## CONCLUSION

{¶ 28} We thus hold that the trial court abused its discretion when it denied the Andres' claim for prejudgment interest, as "there was no sound reasoning process that would support that decision." *AAAA Enterprises, Inc. v. River Place Community Urban Redevelopment Corp.* (1990), 50 Ohio St.3d 157, 161, 553 N.E.2d 597. The assignment of error is sustained. From the record of the trial and the hearing on the Andres' motion for prejudgment interest, we are persuaded that Case and Ewing, as a matter of law, failed to make a good-faith offer to settle with the Andres as mandated by R.C. 1343.03(C), and that the Andres did not fail to make a good-faith effort to settle. We award prejudgment interest in the sum of $286,000, which is to be calculated at the rate of ten percent per annum from September 17, 1998, the date the claims for relief accrued, through September 16, 2002, the date Case paid the judgment. See *Moskovitz v. Mt. Sinai Med. Ctr.,* 69 Ohio St.3d at 664, 635 N.E.2d 331.

Judgment reversed
and final judgment entered.

SUNDERMANN, P.J., and WINKLER, J., concur.