ROSS, Admr., Appellee,

v.

ST. ELIZABETH HEALTH CENTER et al., Appellant.

[Cite as *Ross v. St. Elizabeth Health Ctr.*, 181 Ohio App.3d 710, 2009-Ohio-1506.]

Court of Appeals of Ohio,
Seventh District, Mahoning County.

No. 08 MA 17.

Decided March 26, 2009.

712

[redacted]

Betras, Maruca, Kopp & Harshman, Brian P. Kopp, and Christopher A. Maruca, for appellee.

Roetzel & Andress, L.P.A., Michael J. Hudak, and Michael J. Fuchs, for appellant.

---

DeGenaro, Judge.

{¶ 1} This timely appeal comes for consideration upon the record in the trial court, the parties' briefs, and their oral arguments before this court. Appellant, Mahoning Valley Emergency Specialists, Inc. ("MVES"), appeals the judgment of the Mahoning County Court of Common Pleas granting prejudgment interest to appellee, Steven W. Ross, administrator of the estate of Darlene Marie Ross, deceased, as well as a jury verdict entered against MVES in the amount of $754,649 in a medical-malpractice and wrongful-death action.

{¶ 2} MVES first argues that the trial court abused its discretion by precluding one of its expert witnesses from testifying about proximate cause during the trial, warranting a new trial. Second, MVES argues that the trial court abused its discretion by granting Ross's motion for prejudgment interest and alternatively urges this court to find Ohio's prejudgment-interest statute unconstitutional.

{¶ 3} Upon review of the record, all of MVES's arguments are meritless. With regard to the evidentiary matter, MVES proffered its expert as a standard-of-care witness only. As such, the trial court properly limited that expert to testifying only about medical conditions known to the defendant physician when treating the decedent. In addition, based on *Galayda v. Lake Hosp. Sys., Inc.* (1994), 71 Ohio St.3d 421, 428, 644 N.E.2d 298, we cannot find Ohio's prejudgment-interest statute, R.C. 1343.03(C), unconstitutional. Further, the trial court did not abuse its discretion by awarding prejudgment interest in this case, as MVES failed to rationally evaluate the risks and potential liability involved in the litigation and further failed to make a good-faith monetary settlement offer or respond in good faith to Ross's settlement demand. Accordingly, the judgment of the trial court is affirmed.

## Facts

{¶ 4} On the morning of December 15, 2002, Darlene Ross, Ross's decedent, began to experience severe back pain. She was transported by ambulance to St. Elizabeth Health Center's emergency department. Upon her arrival, Darlene's blood pressure was 208 over 89. Darlene had vomited and complained of severe pain, and she was writhing around, unable to get comfortable.

{¶ 5} St. Elizabeth contracts with MVES to staff its emergency room with physicians and physician assistants. Dr. David Jackson, an MVES physician and principal, physically examined Darlene in the emergency room that morning. Based on the medical history Darlene provided at triage, Dr. Jackson knew that Darlene had a history of hypertension, kidney disease, and stroke. He also knew she took several antihypertensive medications.

{¶ 6} Ultimately, Dr. Jackson diagnosed Darlene with a "strained back" and prescribed pain medications. Darlene reported that these medications slightly relieved her pain. Without performing any additional testing or rechecking Darlene's blood pressure, Dr. Jackson discharged Darlene from the emergency department, with instructions to take her blood-pressure medications as directed.

{¶ 7} After returning home, Darlene's symptoms worsened. Later that day, she presented to Northside Medical Center with complaints of sharp, severe abdominal pain radiating to her back, along with nausea and vomiting. Upon examination, her blood pressure was elevated and her abdomen was tender. Soon after her arrival at Northside, Darlene stopped breathing and her pulse

ceased. She died shortly thereafter. An autopsy revealed that the cause of death was an acute ruptured Type B dissecting aortic aneurysm.

{¶ 8} Ross filed a medical-malpractice and wrongful-death complaint, alleging that MVES had negligently caused Darlene's death. Initially, St. Elizabeth was also named as a defendant; however, Ross voluntarily dismissed it from this case, without prejudice.

{¶ 9} Prior to trial, Ross filed a motion in limine requesting, among other things, an order prohibiting MVES from introducing any evidence or testimony from Dr. Gayle Galan regarding the existence of a condition called thrombocytopenic purpura ("TTP") or the issue of survivability. The trial court overruled the motion in limine.

{¶ 10} The case proceeded to trial and Ross called three expert witnesses, one of whom was Dr. Robert Rhee, a vascular surgeon. Dr. Rhee opined that Dr. Jackson had deviated from the standard of care when treating Darlene and that this deviation caused Darlene's death. He testified that Darlene arrived at St. Elizabeth with a "textbook presentation" of an aortic dissection, i.e., she had risk factors in her medical history, had experienced a recent hypertensive event, and was writhing or thrashing around with 10/10 level radiating pain. He further testified that a chest x-ray or a check of the pulses in Darlene's lower extremities could have led to the diagnosis of the aortic dissection, but that Dr. Jackson failed to order such tests.

{¶ 11} Dr. Rhee also testified about treatment options for Darlene's aortic dissection, had it been discovered by Dr. Jackson. He explained that in his experience, 98 percent of patients with an acute aortic dissection are treated "medically." This means they are administered medications to slow the heart rate and lower the blood pressure, and are monitored closely until pressure to the aorta subsides. He noted that with this so-called "medical management" option, the overall survival rates are about 90 percent after five years and 60–70 percent after ten years. In Dr. Rhee's opinion, nothing in Darlene's past medical history would have caused him concern about using medical-management techniques. However, he conceded that medical management would require lifetime use of medications and that strict compliance with the medication regime would be necessary for survival. Finally, Dr. Rhee testified about treatment options available for aortic dissections if medical-management techniques fail. He explained that such a situation would necessitate a rather risky surgical procedure to repair the tear in the aorta.

{¶ 12} Ross presented two other expert witnesses at trial. However, their testimony is not part of the appellate record, because MVES ordered a partial transcript containing only Dr. Rhee's testimony and Dr. Galan's testimony. Dr. Galan, an emergency-room physician, was MVES's sole expert witness at trial.

{¶ 13} Prior to Dr. Galan's testimony, Ross renewed his motion in limine, and an in camera hearing was held. At issue was the scope of Dr. Galan's testimony, namely, whether she would provide testimony about both standard-of-care and proximate-cause issues. At the start of the hearing, the trial court first explained its concern about whether Dr. Galan was qualified to testify about surgical survivability, which is a proximate-cause issue. The court then ruled that Dr. Galan would not be permitted to testify about surgical survivability, after noting that at a sidebar moments earlier, before the trial court and counsel adjourned to chambers for the in camera hearing, counsel for MVES had represented that he did not intend to question Dr. Galan about this topic.

{¶ 14} Then MVES started to proffer Dr. Galan's testimony about medical survivability, which is also a proximate-cause issue. After a prolonged discussion, however, MVES clearly stated that Dr. Galan would testify as a standard-of-care witness only. Ultimately, the trial court ruled that Dr. Galan would not be permitted to discuss any medical conditions that were not known to Dr. Jackson at the time he treated Darlene.

{¶ 15} Following the in camera hearing, Dr. Galan testified in front of the jury. She opined that Dr. Jackson met the standard of care for an emergency physician when he treated Darlene. More specifically, Dr. Galan felt that Dr. Jackson's diagnosis of "back strain" was reasonable based on Darlene's presentation at St. Elizabeth. According to Dr. Galan, a patient who presents with dissecting aorta is characterized by "ripping" chest pain and sweatiness, two symptoms that Darlene did not have. Dr. Galan concluded that Darlene's symptoms were more consistent with a strained back.

{¶ 16} Dr. Galan also opined that there was no indication that Dr. Jackson should have ordered additional tests, such as a chest x-ray or CAT scan. Further, in Dr. Galan's opinion, a chest x-ray would not have been particularly useful in diagnosing the aortic dissection. Dr. Galan also addressed Dr. Jackson's failure to order medications to lower Darlene's blood pressure, despite Darlene's presentation with a blood pressure of 208 over 89. Dr. Galan felt this was reasonable on the part of Dr. Jackson, because Darlene's history of hypertension would have made it dangerous to quickly lower her blood pressure.

{¶ 17} During cross-examination, it emerged that Dr. Galan had testified as an expert in a separate, unrelated medical-malpractice case, where she was critical of an emergency-room physician who had failed to diagnose the aortic dissection of a patient who presented with symptoms similar to Darlene's.

{¶ 18} After four days of testimony, the jury returned a verdict in Ross's favor in the amount of $754,649. The trial court entered judgment on that verdict on October 2, 2007. Ross then filed a motion for prejudgment interest, to which MVES replied. A hearing was held, at which Ross called three witnesses: Dr.

Jackson; Dr. Howard Dickey–White, an MVES physician and the president of MVES; and Angela Yost, a claims specialist for Pro Insurance, MVES's insurance carrier. MVES cross-examined those witnesses but did not present any witnesses of its own. Ross also presented numerous exhibits at the hearing, including a settlement demand letter for $475,000 that it had sent to MVES prior to trial.

{¶ 19} In a judgment entry filed on January 7, 2008, the trial court granted Ross's motion for prejudgment interest. The court found that MVES, Dr. Jackson, and their insurer failed to rationally evaluate the risks of the case and further failed to make a good-faith effort to settle. Therefore, the court found that prejudgment interest was proper pursuant to R.C. 1343.03(C)(1).

### Limitation of Testimony by Dr. Galan

{¶ 20} MVES asserts in its first of two assignments of error:

{¶ 21} "The trial court abused its discretion by precluding Appellant's expert witness from testifying regarding matters within the scope of her education, knowledge, and experience."

{¶ 22} MVES asserts that it intended to elicit testimony from Dr. Galan about the following topics: (1) Darlene's failure to take her blood-pressure medication according to her doctor's orders, (2) Darlene's difficulty managing her blood pressure, (3) Darlene's medical history of a clotting disorder called TTP, and (4) the underlying cause of Darlene's prior stroke. On appeal, MVES insists that it intended to use that testimony to refute Dr. Rhee's proximate-cause opinion that Darlene's dissecting aortic aneurysm could have been easily medically managed.

{¶ 23} During her deposition, Dr. Galan noted that in her initial written summary, she had provided an opinion as to standard of care only. However, she went on to state that she had subsequently formed an opinion relating to proximate cause, namely, with regard to surgical survivability. More specifically, Dr. Galan testified that a blood sample taken minutes before Darlene's death revealed Darlene had a very low platelet count, something that Dr. Galan attributed to the presence of TTP. Dr. Galan opined that the low platelet count would have made it difficult for Darlene to survive surgery for an aortic dissection. Ross's counsel then challenged whether Dr. Galan was qualified to give an opinion about surgical survivability. Ultimately, Dr. Galan admitted that she had never performed a surgery to repair a dissecting aortic aneurysm. She stated she had assisted on several such procedures, but not during the previous six or seven years. Dr. Galan admitted she does not regularly perform any kind of surgery and stated that if she diagnosed a patient with a dissecting aortic aneurysm during the course of her practice, she would refer that patient to a cardiothoracic surgeon. Further, Dr. Galan admitted she holds no certifications

in hematology or vascular surgery and that she is certified only in emergency medicine. Notably, Dr. Galan gave no opinion during her deposition about whether TTP or any other factors would have affected medical survivability.

{¶ 24} Prior to trial, Ross filed a motion in limine requesting, among other things, that the trial court prohibit Dr. Galan's testimony "regarding the issue of a condition called Thrombocytopenic purpura [TTP] or the issue of survivability as it pertained to Darlene Ross on December 15, 2002."

{¶ 25} The trial court initially denied the motion in limine. However, prior to Dr. Galan's testimony at trial, Ross renewed the motion, and after an initial sidebar, an in camera hearing was held to decide it. The court ultimately ruled that Dr. Galan could not testify about any medical conditions that were not known to Dr. Jackson when he treated Darlene. Thus, the trial court precluded proximate-cause testimony, limiting Dr. Galan to testifying only about the standard of care. MVES contends that this limitation constitutes prejudicial error. Ross counters that MVES failed to proffer Dr. Galan as a proximate-cause witness. We agree.

{¶ 26} "An order granting or denying a motion in limine is a tentative, preliminary or presumptive ruling about an evidentiary issue that is anticipated." *State v. Grubb* (1986), 28 Ohio St.3d 199, 203, 28 OBR 285, 503 N.E.2d 142. As such, at trial, a party seeking to admit evidence that was the subject of a motion in limine must "seek the introduction of [that] evidence by proffer or otherwise in order to enable the court to make a final determination as to its admissibility and to preserve any objection on the record for purposes of appeal." Id.

{¶ 27} Proffers are governed by Evid.R. 103. "Pursuant to [Evid.R. 103] a party may not predicate error on the exclusion of evidence during direct examination unless two conditions are met: (1) the exclusion of the evidence must affect a substantial right of the party, and (2) the substance of the excluded evidence was made known to the court by proffer or was apparent from the context within which questions were asked." *Orbit Electronics, Inc. v. Helm Instrument Co., Inc.*, 167 Ohio App.3d 301, 2006-Ohio-2317, 855 N.E.2d 91, ¶ 24, citing *State v. Gilmore* (1986), 28 Ohio St.3d 190, 28 OBR 278, 503 N.E.2d 147. The first prong is not at issue in the present case; the issue is whether MVES adequately proffered the testimony at issue.

{¶ 28} In *State v. Heinish* (1990), 50 Ohio St.3d 231, 241, 553 N.E.2d 1026, the Ohio Supreme Court described two different methods that may be used to proffer testimony. The first is a question-and-answer method whereby the sworn testimony of the excluded witness is taken outside the presence of the jury. The second permits the proponent of the evidence to proffer to the court the substance of what the evidence would have shown.

{¶ 29} Regardless of the method chosen, "[g]enerally, an offer of proof consists of two elements. First, the offering party must inform the trial court as to the legal theory upon which admissibility is proposed. Second, an offering party must show what a witness was expected to testify to and what that evidence would have proven or tended to prove." *State v. Darrah*, 12th Dist. No. CA2006–09–109, 2007-Ohio-7080, 2007 WL 4554952, at ¶ 22, citing *Moser v. Moser* (1991), 72 Ohio App.3d 575, 580, 595 N.E.2d 518. Here, MVES failed to proffer the legal theory, to wit, proximate cause.

{¶ 30} MVES asserts that Dr. Galan's testimony about Darlene's failure to take her blood-pressure medication according to her doctor's orders, Darlene's difficulty managing her blood pressure, Darlene's medical history of a clotting disorder called TTP, and the underlying cause of Darlene's prior stroke was offered to refute Dr. Rhee's testimony about proximate cause. Specifically, MVES argues that Dr. Galan's testimony would have countered Dr. Rhee's opinion that Darlene could have survived the aortic dissection by the use of medical-management techniques.

{¶ 31} However, MVES failed to proffer to the court that Dr. Galan's testimony would go towards the legal theory of proximate cause. During the in camera hearing, MVES affirmed that it did not intend to have Dr. Galan testify about surgical survivability, which is a proximate-cause issue. MVES began to offer Dr. Galan's testimony about medical survivability, another proximate-cause issue, stating: "[Y]ou will hear testimony this afternoon that's going to be very conclusive that medical management is not going to be effective on this patient based on her history."

{¶ 32} However, after a prolonged discussion, MVES represented to the court that Dr. Galan was a standard-of-care witness, not a proximate-cause witness. Specifically, counsel stated:

{¶ 33} "Your Honor, we are not going into long-term care of how this patient is going to be managed forever. We are going to go into standard of care. We are going to go into standard of care for an emergency physician."

{¶ 34} Ultimately, the trial court made its evidentiary ruling based on MVES's proffer of Dr. Galan as a standard-of-care witness only. Since standard of care is never viewed in hindsight, the court properly ruled to limit Dr. Galan's testimony to only that information known to Dr. Jackson when he treated Darlene. See *Grabill v. Worthington Industries, Inc.*, 98 Ohio App.3d 739, 744–745, 649 N.E.2d 874, quoting *Hetrick v. Marion–Res. Power Co.* (1943), 141 Ohio St. 347, 358–359, 25 O.O. 467, 48 N.E.2d 103 (holding that "[f]oresight, not retrospect, is the standard of diligence").

{¶ 35} MVES insists that even if we find that it failed to proffer the testimony, a proffer was actually unnecessary for two reasons. Both of these arguments are meritless. First, MVES argues that the limitation by the trial court concerned Dr. Galan's competency as an expert and therefore a proffer was unnecessary. MVES cites *Totten v. Miller's Estate* (1941), 139 Ohio St. 29, 21 O.O. 545, 37 N.E.2d 961, for the proposition that a proffer is unnecessary when a witness is excluded on the basis of her alleged incompetency and that such an exclusion will be deemed prejudicial. However, the holding in *Totten* is inapplicable to the case at bar because the issue was that the trial court improperly excluded the expert witness altogether. Id.

{¶ 36} Moreover, the trial court in this case did not limit Dr. Galan's testimony on the basis of her incompetency. Dr. Galan's qualifications were only called into question with regard to the issue of surgical survivability, a proximate-cause issue. However, counsel for MVES agreed that Dr. Galan would not testify about surgical survivability. The trial court's evidentiary ruling at the close of the in camera hearing did not relate to Dr. Galan's competency. Rather, the court ruled that Dr. Galan could not testify about medical conditions not known to Dr. Jackson when he treated Darlene, since such testimony falls outside the scope of a standard-of-care opinion.

{¶ 37} Second, MVES argues that pursuant to Evid.R. 103(A)(2) and *State v. Gilmore* (1986), 28 Ohio St.3d 190, 28 OBR 278, 503 N.E.2d 147, a proffer was not necessary because the substance of the excluded evidence was apparent to the court from the context within which questions were asked at trial. MVES correctly states the law here. However, MVES fails to indicate precisely *when* during Dr. Galan's testimony the substance of the excluded evidence was "apparent to the court." A review of Dr. Galan's testimony does not reveal any point where the substance of the excluded testimony was apparent. Dr. Galan abided by the court's ruling and testified only about medical conditions that were known to Dr. Jackson when he treated Darlene. She offered only an opinion about standard of care, not one on proximate cause, either relating to surgical survivability or medical-management survivability. Thus, this argument is also meritless.

{¶ 38} In sum, MVES failed to adequately proffer Dr. Galan as a proximate-cause witness who would testify about medical survivability, instead proffering her as a standard-of-care witness only. The trial court properly ruled that Dr. Galan could testify only about those conditions known to Dr. Jackson at the time he treated Darlene, in light of Dr. Galan's proffered function as a standard-of-care witness. Accordingly, MVES's first assignment of error is meritless.

### Prejudgment Interest

{¶ 39} In its second assignment of error, MVES argues:

{¶ 40} "The trial court abused its discretion by granting Appellee's Motion for Prejudgment Interest."

{¶ 41} This assignment of error contains two parts. First, MVES argues that Ohio's prejudgment-interest statute, R.C. 1343.03(C), is unconstitutional. Second, MVES argues that even if R.C. 1343.03(C) is constitutional, the trial court nonetheless abused its discretion by awarding prejudgment interest in this case. Each of these subarguments will be discussed in turn.

### Constitutionality of R.C. 1343.03(C)

{¶ 42} MVES argues that Ohio's prejudgment-interest statute, R.C. 1343.03(C), violates its constitutional right to a trial by jury. MVES concedes that the Ohio Supreme Court rejected a similar argument in *Galayda v. Lake Hosp. Sys., Inc.* (1994), 71 Ohio St.3d 421, 428, 644 N.E.2d 298, and held that R.C. 1343.03(C) is constitutional. However, MVES contends that the holdings of two more recent Ohio Supreme Court cases, when read together, somehow abrogate the holding in *Galayda.* This argument is meritless.

{¶ 43} In *Galayda,* the Ohio Supreme Court held that Ohio's prejudgment-interest statute does not violate the right to a jury trial for several reasons. First, the court found that "the potential application of R.C. 1343.03 in no way precludes a defendant from insisting on exercising his right to trial by jury nor does it 'create a financial barrier that prevents a * * * party from taking his case to a jury.'" Id. at 427, 644 N.E.2d 298, quoting *Kuenzer v. Teamsters Union Local 507* (1981), 66 Ohio St.2d 201, 203, 20 O.O.3d 205, 420 N.E.2d 1009, fn. 6. Second, the court found that R.C. 1343.03 does not impose a penalty upon defendants for having exercised their right to a jury where prejudgment interest is awarded against them, and that actually the prejudgment-interest statute is "wholly compensatory * * * in nature." *Galayda* at 427–428, 644 N.E.2d 298.

{¶ 44} Finally, the court reasoned that:

{¶ 45} "[I]t is the jury's function to determine the amount of damages suffered by a plaintiff. Since determining the amount of prejudgment interest awards is entirely separate and distinct from determining the amount of damages suffered by the plaintiff, and does not involve questions of fact, R.C. 1343.03 does not violate the fundamental constitutional right to a trial by jury." *Galayda,* 71 Ohio St.3d at 428, 644 N.E.2d 298.

{¶ 46} However, MVES argues that *Galayda* is "no longer good law" based on two more recent Ohio Supreme Court cases: *Miller v. First Internatl. Fid. & Trust Bldg., Ltd.,* 113 Ohio St.3d 474, 2007-Ohio-2457, 866 N.E.2d 1059, and

*Arbino v. Johnson & Johnson,* 116 Ohio St.3d 468, 2007-Ohio-6948, 880 N.E.2d 420. Admittedly, the court in *Miller* did conclude that an award of prejudgment interest "requires judicial fact-finding and the exercise of judicial discretion" and "that as between damages and costs, prejudgment interest is more in the nature of damages." *Miller* at ¶ 7. In addition, the court in *Arbino* did find that the right to a trial by jury protects a plaintiff's right to have a jury determine all issues of fact, including the amount of damages. *Arbino* at ¶ 34.

{¶ 47} However, neither *Miller* nor *Arbino* directly addresses the constitutionality of R.C. 1343.03(C). In *Miller,* the court held that a journalized jury verdict is not a final, appealable order when a motion for prejudgment interest has been filed and remains pending. *Miller* at ¶ 11. In *Arbino,* the court held that R.C. 2315.18 (a statute limiting noneconomic damages) does not violate Ohio's constitutional right to a jury trial, and R.C. 2315.21 (a statute limiting punitive damages) does not violate equal protection or due process. *Arbino* at ¶ 42, 104–106.

{¶ 48} By contrast, the court in *Galayda* directly addressed the constitutionality of R.C. 1343.03(C) and found it constitutional. *Galayda,* 71 Ohio St.3d at 428, 644 N.E.2d 298. The Ohio Supreme Court has never overruled its holding in *Galayda,* and therefore that holding is still good law that this court should follow. See generally *Scibelli v. Pannunzio,* 7th Dist. No. 05MA150, 2006-Ohio-5652, 2006 WL 3059876, at ¶ 122 (noting that "[p]rejudgment interest statutes have consistently been found to be constitutional by courts both in Ohio and elsewhere," and citing cases). Accordingly, we find that MVES's argument about the constitutionality of R.C. 1343.03(C) is meritless.

### Abuse of Discretion

{¶ 49} In the second part of its second assignment of error, MVES argues that even if R.C. 1343.03(C) is constitutional, the trial court's prejudgment-interest award should be reversed because it was an abuse of discretion.

{¶ 50} The Ohio Supreme Court in *Moskovitz v. Mt. Sinai Med. Ctr.* (1994), 69 Ohio St.3d 638, 658, 635 N.E.2d 331, explained that R.C. 1343.03(C) sets forth four requirements for the award of prejudgment interest: (1) the party seeking interest must petition the court no later than 14 days after the judgment, (2) the trial court must hold a hearing on the motion, (3) the court must find that the party required to pay the judgment failed to make a good-faith effort to settle, and (4) the court must find that the party to whom the judgment is to be paid did not fail to make a good-faith effort to settle the case.

{¶ 51} Further, the court noted that "[t]he statute uses the word 'shall.' Therefore, if a party meets the four requirements of the statute, the decision to allow or not allow prejudgment interest is not discretionary. What is discretionary with the trial court is the determination of lack of good faith." Id.

{¶ 52} Thus, an appellate court should reverse a trial court's determination as to lack of good faith only when there has been an abuse of discretion. This means that the trial court's decision "will be upheld when it is supported by some competent, credible evidence." *Hollobaugh v. D & V Trucking* (May 8, 2001), 7th Dist. No. 99CA303, 2001 WL 537058, at *8, citing *Doyle v. Fairfield Machine Co., Inc.* (1997), 120 Ohio App.3d 192, 223, 697 N.E.2d 667.

{¶ 53} In *Kalain v. Smith* (1986), 25 Ohio St.3d 157, 25 OBR 201, 495 N.E.2d 572, syllabus, the court explained, in the negative, what constitutes a "good faith effort to settle." That is, "[a] party has *not* 'failed to make a good faith effort to settle' under R.C. 1343.03(C) if he has (1) fully cooperated in discovery proceedings, (2) rationally evaluated his risks and potential liability, (3) not attempted to unnecessarily delay any of the proceedings, and (4) made a good faith monetary settlement offer or responded in good faith to an offer from the other party." (Emphasis added.) Id. at syllabus. Further, the court held that "if a party has a good faith, objectively reasonable belief that he has no liability, he need not make a monetary settlement offer." Id.

{¶ 54} In the present case, both parties agree that the first and third elements are not at issue. In other words, there are no allegations that either side failed to cooperate with discovery or unnecessarily delayed the proceedings. Rather, the only issues are whether MVES rationally evaluated the risks and potential liability and made a good-faith monetary settlement offer.

{¶ 55} It is undisputed that MVES failed to respond to Ross's settlement offer and failed to make a settlement offer of its own. Still, MVES contends that it rationally evaluated the risk and had a good-faith, reasonable belief that it was not liable.

{¶ 56} The trial court disagreed, finding:

{¶ 57} "Plaintiff made a good faith effort to settle this case for an amount far below that which was awarded at trial, and * * * the defense ignored Plaintiff's demand. Defendant never made any effort to settle the case or even to engage in settlement discussions. The Court further finds that Defendant and its insurer failed to rationally evaluate the risks and potential liability faced by Defendant in adopting an unwavering position that settlement would not be considered no matter what Plaintiff had to present, and that 'the Doctor would receive his day in Court.' Under the circumstances of this case, neither the Doctor, nor his corporation [MVES], nor his insurance carrier rationally evaluated the risk in this case, nor did any of them engage in a 'good faith effort to settle the case.' "

{¶ 58} The trial court's decision is supported by competent, credible evidence. At the prejudgment-interest hearing, Dr. Jackson testified that his written

consent was required to settle the case. And although Dr. Jackson recognized that there was, in his opinion, "minimal risk" of an adverse outcome at trial, he failed to consent to even a minimal settlement offer. He testified that he reviewed the evidence that emerged during discovery, including the opinions of two doctors who believed that he fell short of the standard of care, but nonetheless adhered to his decision not to consent to settlement. When asked why he withheld consent to settle, he replied that (1) he felt he had "practiced appropriate medicine" and (2) he wanted his "day in court." Further, Dr. Jackson said he was aware of the $475,000 settlement demand but could not recall having any discussions with his insurance carrier about responding to the demand. Most notably, Dr. Jackson testified that it was his intention from beginning to end to maintain the position that he would not give consent to settle the matter.

{¶ 59} Dr. White also testified at the prejudgment-interest hearing. He stated that as president of MVES, it was his understanding that he had the authority to overrule Dr. Jackson's decision to withhold consent, but he chose to leave the decision to Dr. Jackson. He further testified that he did not review any discovery materials aside from the emergency-room records. He agreed that a medical-malpractice case in which a death has occurred poses a potential for serious damages. Despite those risks, he never considered settlement. Dr. White also testified that he did not recall ever discussing Ross's $475,000 settlement demand.

{¶ 60} Finally, Angela Yost, a claims adjuster for MVES's insurance carrier, testified. She admitted that there were risks involved in going to trial but that even after reviewing all of the discovery materials, she never asked Dr. Jackson for his consent to settle. It was her understanding that Dr. Jackson "wanted his day in court." Yost claimed she made a "good faith effort to settle the case," but when asked to define what that meant, she was unable to do so. She conceded that actually no efforts were made to settle the case.

{¶ 61} Based on the above, the trial court's award of prejudgment interest was supported by competent, credible evidence. All the witnesses testified that despite the potential risks involved, settlement was never considered. Nonetheless, MVES urges us to find that the trial court abused its discretion. In so doing, it likens its case to *Evans v. Dayton Power & Light Co.*, 4th Dist. No. 05CA800, 2006-Ohio-319, 2006 WL 199624, a case in which the court found that the trial court abused its discretion by granting prejudgment interest. In *Evans*, the court found that the defendant's position of nonliability was rational and therefore the defendant was not obligated to engage in settlement discussions.

{¶ 62} However, *Evans* is distinguishable from the present case in several key respects. First, the defendant in *Evans* did make a settlement offer. Second,

the nature of the case and the potential defenses in *Evans* are quite different from this case.  In *Evans*, the defendant believed it would not be found liable because it predicted the jury would find that the plaintiff's conduct was an intervening cause for which the plaintiff was more than 50 percent liable.  In the end, the jury found the plaintiff 27 percent liable.  Further, the defendant in *Evans* had several other viable defenses that could have obviated liability.

{¶ 63} By contrast, MVES failed to make any settlement offer, did not respond to Ross's settlement demand, and did not have any similarly viable defenses.  The case is similar to *Garrett v. St. Elizabeth Health Ctr.* (2001), 142 Ohio App.3d 610, 756 N.E.2d 698, in which this court upheld the trial court's prejudgment-interest award.  The defendant in *Garrett* also failed to make a settlement offer or to respond to the plaintiff's settlement demands.  Further, a risk manager for the defendant in *Garrett* testified that despite the potential risk of litigation, he decided to "roll the dice" and go forward with the "battle of experts" rather than make any attempt at settlement.  Similarly, in this case, Dr. Jackson, Dr. White, and Ms. Yost all held similar attitudes towards settlement.

{¶ 64} Moreover, "although it cannot be the only factor considered, a substantial disparity between an offer and a verdict is one factor that may be considered as demonstrating whether a party made a good-faith effort to settle." *Burton v. Slusher*, 7th Dist. No. 07–MA–143, 2008-Ohio-4812, 2008 WL 4325911, at ¶ 102, citing *Andre v. Case Design, Inc.*, 154 Ohio App.3d 323, 2003-Ohio-4960, 797 N.E.2d 132, at ¶ 15.  In this case, the jury verdict was $754,649, and defendant refused to respond to Ross's settlement offer at all.  It goes without saying that this is a substantial disparity.

{¶ 65} In sum, the trial court's award of prejudgment interest in this case was reasonable, supported by competent, credible evidence, and therefore not an abuse of discretion.  Accordingly, we affirm the trial court's prejudgment-interest award.  MVES's second assignment of error is meritless.

## Conclusion

{¶ 66} All of MVES's arguments are meritless.  With regard to the evidentiary matter, MVES failed to adequately proffer the testimony at issue.  MVES failed to explain during the in camera hearing that Dr. Galan would provide proximate-cause testimony relating to the issue of medical management.  In addition, based on *Galayda v. Lake Hosp. Sys., Inc.* (1994), 71 Ohio St.3d 421, 428, 644 N.E.2d 298, we cannot find Ohio's prejudgment-interest statute, R.C. 1343.03(C), unconstitutional.  Further, the trial court did not abuse its discretion by granting prejudgment interest in this case, since MVES failed to rationally evaluate the risks and potential liability involved in the litigation and further failed to make a

good-faith monetary settlement offer or respond in good-faith to Ross's settlement demand. Accordingly, the judgment of the trial court is affirmed.

Judgment affirmed.

VUKOVICH, P.J., and DONOFRIO, J., concur.